1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3

4    UNITED STATES OF AMERICA     .   4:15-CR-00263-1

5    VERSUS                       .   HOUSTON, TEXAS

6    ASHER ABID KHAN              .   JUNE 2, 2015

7    . . . . . . . . . . . . . .  .   11:00 A.M.

8                 TRANSCRIPT OF IN-CHAMBERS CONFERENCE
                  BEFORE THE HONORABLE LYNN N. HUGHES
9                    UNITED STATES DISTRICT JUDGE

10                          *APPEARANCES*

11

12   FOR THE GOVERNMENT:

13        Carolyn Ferko and Abe Martinez
          Assistant United States Attorneys
14        1000 Louisiana
          Suite 2300
15        Houston, Texas  77002

16   FOR THE DEFENDANT:

17        Thomas S. Berg
          Attorney at Law
18        4306 Yoakum Boulevard
          Suite 400
19        Houston, Texas  77006

20   OFFICIAL COURT REPORTER:

21        Mayra Malone, CSR, RMR, CRR
          U.S. Courthouse
22        515 Rusk, Room 8004
          Houston, Texas  77002

23
     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25

```
 1                       P R O C E E D I N G S
 2            THE COURT:  Tell me about M.
 3            MS. FERKO:  That is Mais Suidad.  She is a friend of
 4    Asher Khan's for quite a while.
 5            THE COURT:  What kind of friend?
 6            MS. FERKO:  With religion, I would not call her a
 7    girlfriend.  They went to school together.  She, I believe, is
 8    one grade younger than he is.  I'm not sure about age.  I'm
 9    just talking about grade.  I don't know if something occurred,
10    but she is a confidant of his.  Her family is from Iraq.  We
11    did not mention this in the hearing.  Initially Asher Khan had
12    contacted Mais because of her family contacts in Iraq.  He had
13    wanted to join ISIS.  He didn't know how.  He reached out
14    online to numerous individuals.
15            THE COURT:  Why didn't he take a bus to Syria?  They
16    have plenty of them there.
17            MS. FERKO:  And so he talked to her specifically --
18            THE COURT:  Or join the French Foreign Legion and go
19    to France.
20            MS. FERKO:  She actually has specific cousins in Iraq
21    that live there, and he was talking while he was living in
22    Australia --
23            THE COURT:  I still have relatives in Canada.  Does
24    that make me suspect?
25            MS. FERKO:  He spoke to her and asked her if she could
```

1    help him -- she could talk to the cousins who he -- it appeared

2    from the conversation that he had met before, he knew and would

3    she help him try to get with ISIS.  And he thought she knew

4    someone with ISIS he could get with.  Can you find that out for

5    me?  There was much discussion about the ability for him to fly

6    into Baghdad, the airport.  Her cousin said that would be very

7    dangerous for him.  Mais did offer to go with him as his wife

8    if he was to travel, but her citizenship is pending, so she

9    does not have a passport.  Her passport is pending with --

10            THE COURT:  If she leaves the country, she has to wait

11    another year or two.

12            MS. FERKO:  Right.  I mean, there are other rules, but

13    she had not been given a passport or her citizenship as a

14    matter of course.

15            THE COURT:  Why didn't you indict her?

16            MS. FERKO:  Because once she talked to the cousin and

17    the cousin said, "You can't come here, it is too dangerous,"

18    she said, "I don't think you should go at all."  And then she

19    starts trying to talk him out of it a bit.

20            THE COURT:  So she is a recanted --

21            MR. MARTINEZ:  Not a full recruit, Your Honor.

22            MS. FERKO:  I think it was more she was talking

23    about --

24            THE COURT:  He is not a recruit.

25            MR. MARTINEZ:  He is a recruiter.

 1              THE COURT:  He is a volunteer.

 2              MR. MARTINEZ:  And a recruiter, Your Honor.

 3              THE COURT:  Who is he recruiting?

 4              MR. MARTINEZ:  Well, actually, Judge, he went over

 5      with a man by the name of SRG from McAllen.  They went to

 6      Turkey.  They were all prepared to go into Syria to join ISIS

 7      and then Khan received a call from home and said -- it was a

 8      call that was intended to get him back, and it did.  "Mom is in

 9      grave danger.  She is going to die.  You need to come home

10      immediately."

11              At that point, SRG, who didn't have a contact,

12      which Khan did, said, "What the ... am I going to do?  How am I

13      going to get into Syria?"

14              What Khan did, he has contact with another person

15      who we intend to pick up at some point.  That man put him in

16      direct contact with folks who then took him in to Syria and

17      SRG -- took SRG into Syria.  SRG got in the battlefield.  SRG

18      is no longer with us, but it was solely through the connections

19      that Khan -- it was solely through Khan's connection with this

20      other person who we are trying to --

21              THE COURT:  That's what he apparently wanted.

22              MR. MARTINEZ:  And I believe that Khan would probably

23      have met the same fate that SRG had if he hadn't received that

24      call.  And he recruited SRG.

25              THE COURT:  They went together.  How do you know he

1    recruited?

2           MS. FERKO:  Well, they didn't go together, Your Honor.

3    They had known each other through high school, through Tomball.

4           THE COURT:  SRG?

5           MS. FERKO:  SRG and Khan.

6           THE COURT:  Did anybody stay?

7           MS. FERKO:  Pardon?

8           THE COURT:  They are talking and conspiring and having

9    all of these friends, they should have been in chemistry lab or

10   something.

11          MS. FERKO:  Most of this was done on social media, on

12   Facebook.  So they became Facebook friends in January of 2014

13   where Khan starts telling him, "I want to go to ISIS.  Do you

14   want to come with me?  Here are some videos with some

15   background on ISIS.  Take a look.  Let me know what you think."

16   And clearly they had some previous conversations, whether it

17   was via phone or something else but we --

18          THE COURT:  Maybe they just talked to each other.

19          MS. FERKO:  Well, Khan was in Australia at the time.

20   He was living in Australia at the time, and we know SRG was in

21   McAllen/Brownsville area going up to Houston to see his mother,

22   so they were actually in separate countries.

23          THE COURT:  With whom did he live in Australia?

24          MS. FERKO:  We believe he lived with his uncle.

25          THE COURT:  He was mooching off his relatives?

```
 1            MS. FERKO:  Correct.  Also, I think he had a menial
 2    job, maybe at a gas station.
 3            MR. BERG:  I think he was going to school there.
 4            THE COURT:  That's a menial job.
 5            MS. FERKO:  Just from what Facebook says.  It wasn't
 6    clear he was going to school or where he was working.
 7            MR. BERG:  I guess it was some junior college level
 8    classes he was taking while he was there before he came back
 9    and enrolled at U of H.
10            MR. MARTINEZ:  He wasn't there long enough, it
11    wouldn't seem, Your Honor, to have taken those classes, Tom.
12            THE COURT:  You can always drop out.
13            MS. FERKO:  They offer classes in Arabic.  He also may
14    have gone to a local mosque, which we still can't really narrow
15    down, in Australia.  Typically those mosques offer Arabic
16    classes, and I think one of the purposes was to learn Arabic,
17    so he may have been taking classes but --
18            THE COURT:  He can get Arabic classes anywhere.
19            MR. MARTINEZ:  Sure.
20            MS. FERKO:  Correct.
21            THE COURT:  University of Houston -- I mean University
22    of Texas used to --
23            MS. FERKO:  They still do.
24            THE COURT:  -- have a wonderful Asian, Near Eastern
25    language -- a friend who hated French so much in high school,
```

1    he learned Persian as his language.  It turned out it was very

2    useful because by the time he was a young lawyer working for

3    me, the Shah was deposed.  And he told me one morning that he

4    found out that most French headwaiters are actually Iranians

5    who left, and so he could always get a table by walking up and

6    when they say, "No, there are no tables, I'm sorry, sir," he

7    will say something like, "May a camel have carnal knowledge of

8    your sister," in Persian, and he would get a table right away.

9    You can never tell what your education can do for you.

10             MR. MARTINEZ:  Judge, he didn't go there solely for

11   education.  This other person, who we believe we can capture in

12   Syria, is somebody --

13             MS. FERKO:  There are two people in Australia that we

14   believe --

15             MR. MARTINEZ:  -- who was their recruiter.

16             THE COURT:  You are free to meet with them, but I need

17   an overt act against America as opposed to talking about overt

18   acts.  Think of all the communists we locked up because they

19   sat around and drank mad coffee in the Bronx and talked about

20   how they can lead a proletarian revolution.  That is fine.  But

21   unless there is a high probability of some part of it being

22   accomplishable --

23             MR. MARTINEZ:  Your Honor, the overt act was

24   facilitating, finding the contacts that SRG needed to get into

25   Syria to join the battle.

1          MS. FERKO:  And, Your Honor, the defendant himself --

2          THE COURT:  If already being in Turkey and telling

3    somebody you know in Turkey to talk to him so he can go into

4    Syria and join whatever he wants to join is hardly

5    facilitating.

6          MS. FERKO:  Your Honor, just so you understand, the

7    timeline is a little tricky.  They met in Turkey at the

8    airport.  Khan --

9          THE COURT:  They being?

10         MS. FERKO:  Khan and SRG.

11         MR. MARTINEZ:  Which was preplanned.

12         MS. FERKO:  Preplanned.  But Khan was only there for

13   hours because he caught a flight and flew back to the United

14   States.  Khan did not -- when Khan came to Houston, Texas, Khan

15   then messaged him on Facebook while in Houston saying, "I

16   talked to my friend Mohammed and provided phone numbers to

17   him."  And then SRG messaged him back a few hours later,

18   saying, "The numbers aren't working.  Can you reach out to him

19   again?"  So Khan was in Houston at that point and SRG was left

20   in Turkey.

21         MR. BERG:  The testimony from the agent yesterday when

22   I asked him point blank, "What did he do against the United

23   States," was, "Nothing, zippo."

24         THE COURT:  Your problem is you have got to sort the

25   cranks from the threats to America and, yes, semi-employed,

1    un-fully assimilated -- did he come here as a child?

2              MS. FERKO:  He was born here, Your Honor.

3              MR. BERG:  He was 18.  He was an adolescent still.

4    Lots of stupid stuff going through his head.

5              THE COURT:  And lots of native-born citizens turn into

6    traitors.

7              MR. MARTINEZ:  I mean, Judge, but to simplify,

8    providing a soldier to a terrorist organization is a violation

9    of our law.

10             THE COURT:  No.  Did SRG have any abilities?

11             MS. FERKO:  Yes, Your Honor.

12             MR. MARTINEZ:  As a soldier, sure.

13             THE COURT:  Why?

14             MR. MARTINEZ:  He joined the fray.  He joined the

15   battle.

16             THE COURT:  No.

17             MS. FERKO:  Your Honor, he was a fit youth.  He was

18   working out.  He was ready to go fight and die, and he wanted

19   to kill as many people as possible.  And we have those

20   statements and while he was over there --

21             THE COURT:  Not necessarily against the United States.

22   He could have really been mad at Assad.

23             MR. BERG:  The focus of their travel was to fight

24   Assad, in their discussions.  Of course, that was our focus

25   too.

1          THE COURT:  We had 100 times more information on Major

2     Hassan and nobody did anything.

3          MR. MARTINEZ:  That's true.

4          THE COURT:  And here, instead of focusing on the stuff

5     that is available, we treat any stupid late adolescent -- if

6     it's a man, it's an early adolescent really.  He may have gone,

7     but if you fly to Turkey and turn around and fly back because

8     your mommy is sick, that may be a sign of insanity right there.

9     But I don't see where he is anything other than wholly

10    misguided, and he is playing it, just like all those girls who

11    want to go marry --

12         MS. FERKO:  Your Honor, he did apply again in October

13    of 2014 and what was not said in public at the hearing was that

14    because the FBI's investigation had already started at that

15    time -- we established both those timelines.  He applied to go

16    back for a visa to Australia.  The FBI notified the Australian

17    authorities of their investigation of him and his prior travels

18    and his attempt -- his intent to want to fight with ISIS, so

19    his visa to Australia is in a pending status.  It has not been

20    denied, but the FBI interfered and said --

21         THE COURT:  The thing about Australia, they took my

22    son for a year to the University of Sydney, and I think that's

23    all the damage we ought to do to Australia.  Australia

24    shouldn't let him in.  If I were running Australia, I wouldn't

25    let somebody like that in.

 1              MS. FERKO:  Right.  But it is only because the FBI had

 2     an investigation open that we told Australia.

 3              THE COURT:  It was an investigation.  It doesn't mean

 4     they know anything.  And, besides, that's an intergovernmental

 5     diplomatic thing.  And you don't have to have probable cause or

 6     anything to call a friendly nation and say, "We don't think you

 7     want this person."

 8              MS. FERKO:  I agree, Your Honor.

 9              THE COURT:  That's not criminal justice.  That is

10     diplomacy.

11              MS. FERKO:  This was not the State Department there,

12     which would be the normal course.  This was actually a

13     criminal -- an intelligence agency to their intelligence

14     agency.

15              THE COURT:  We probably have existing relationships

16     for that sort of information.  It probably would have been no

17     different if the FBI discovered he axe murdered his mother.

18              MS. FERKO:  We wouldn't have interfered, frankly,

19     unless we had a warrant out for him.

20              THE COURT:  It is not interference.  You know an axe

21     murderer is heading off somewhere, but the fact that the State

22     Department chooses to let those handle -- just like we have

23     military-to-military relationships with them.  It is still a

24     diplomatic relationship because it is between foreign

25     countries.

1          MR. MARTINEZ:  Judge, in this case, the defendant is

2     charged with material support.  That is, providing a soldier to

3     ISIS.  That's as simple --

4          THE COURT:  I understand what the charge is.  You have

5     yet to prove it.

6          MR. MARTINEZ:  And the fact that he did recruit --

7          MR. BERG:  Actually, he is only charged with

8     conspiracy and attempt.

9          MR. MARTINEZ:  He is charged, Tom, with recruiting SRG

10    and having him go to and join ISIS, which is what he did.

11         THE COURT:  That's not in the indictment.

12         MS. FERKO:  It is part of the allegations.

13         MR. MARTINEZ:  That's what is in Count Two of the

14    indictment.

15         THE COURT:  That's what he said.  You have charged him

16    with conspiracy.

17         MR. BERG:  And attempt.

18         MS. FERKO:  Attempt to provide --

19         THE COURT:  That's anything from talking about it at

20    Denny's and attempting.  He is not charged with doing it.

21         MR. MARTINEZ:  Judge, there are two parts to it.  One

22    is he recruited SRG to become a soldier for ISIS and he did.

23    The attempt part is that he himself agreed to become a soldier

24    for ISIS and attempted to do so and didn't complete the act

25    because he turned around and --

 1          MS. FERKO:  Your Honor, frankly, there would be a

 2    third count for an attempt to provide, the intent to provide

 3    SRG to ISIL.  We waited on that account because we knew we were

 4    going to request search warrants for all his computers, his

 5    phone, items at the house, so we are still searching those

 6    items, so I didn't draft a third count related to SRG because

 7    we were looking for additional proof, and we are also trying to

 8    get proof of his definitive death.  That is also complicated

 9    because he -- while we have a person who contacted his mother

10    using his son's account saying, "Your son is dead, he died as a

11    martyr," you know, that --

12          THE COURT:  Meaning we didn't trust him and shot him.

13          MS. FERKO:  Your Honor, I don't know what that means.

14    But the thing is I don't have DNA.  We have his passport

15    flagged.  No one has used it.  So there are certain things that

16    we can prove in the abstract, but we were still waiting, trying

17    to get some additional proof under some classification stuff,

18    just to be up front with the Court.

19          THE COURT:  He could have been in a bar fight in

20    Aleppo.

21          MR. BERG:  When my client was at the airport in Turkey

22    and had talked with his parents, his father called the FBI

23    emergency number that apparently has been dispensed to the

24    mosques, to ask for help.  And the agent who talked to him told

25    him, "Your son is out of the country.  We have no

```
 1    jurisdiction."  Then they said -- well, that's when they
 2    decided, well, we will just tell him mom is sick.  And they did
 3    and he came home.  He had cold feet before.  There was a
 4    conversation with his friend that they recorded that indicated
 5    he was getting reluctant about it because he knew his parents
 6    weren't approving of this idea.  So he had cold feet.  His
 7    mother is sick.  He comes home.  He is home for all this time,
 8    and it is not until this week that he is this incredible danger
 9    to national security, even though they called the FBI.  And
10    this is the problem.  We are talking about bond.  We are not
11    talking about the trial.
12              MS. FERKO:  Your Honor, he's --
13              THE COURT:  Wait.  He didn't interrupt you all.
14              MR. BERG:  We are talking about whether he is a danger
15    to the community and a risk of flight that can't be addressed
16    by conditions.  Obviously, the conditions are there.
17              THE COURT:  His parents knew about his goal?
18              MR. BERG:  They learned of his goal.  They contacted
19    the FBI.
20              THE COURT:  When?
21              MR. BERG:  They probably learned about it when he
22    went -- when he left Australia and headed to Turkey.
23              THE COURT:  He went to Turkey from Australia?
24              MR. BERG:  He went from Australia to Turkey and then
25    from Turkey back to Houston.
```

1          MS. FERKO:  Your Honor, if I may, at the hearing, it

2     was testified to --

3          THE COURT:  Who testified?

4          MS. FERKO:  Our agent testified that Khan left a

5     letter to his uncle, who he was staying with -- it was

6     addressed to Mahmood, and Khan uploaded a photo of this letter

7     on his Facebook.  The FBI is working to clear it up.  It's very

8     blurry.  It is awful trying to read it.  Ultimately, we believe

9     that --

10         THE COURT:  That sounds like my handwriting.

11         MS. FERKO:  It is typed, but it is just blurred.  It

12    is hard to make out the characters.  Ultimately, that is how

13    his family -- through his uncle contacted his family here in

14    the United States saying that he wasn't coming back; that he

15    believed he was going to go fight.  The letter reads to certain

16    suras in the Koran.  It doesn't say, "I'm going to join ISIS."

17    It doesn't flatout say that.  I'm not trying to say that's what

18    the letter said.  But his uncle was so concerned he did contact

19    the family.  I'm not sure about his family calling the FBI.

20    I'm not aware of that.

21         THE COURT:  Has the FBI called the police in Australia

22    and asked for --

23         MS. FERKO:  But nevertheless --

24         THE COURT:  Wait.  Has the FBI called the police in

25    Australia and asked to get the letter and whatever else from

1      the uncle?

2              MS. FERKO:  Your Honor, we have MLATs that are being

3      written to do that.  I don't know if they will go talk to the

4      uncle.  That has to go through the office of our internal -- or

5      our national affairs, Your Honor.  It is just a legal process

6      in order for the United States to get evidence in another

7      country, including the Five Eyes, friendly country.  We would

8      have to do the same thing with Canada, if we needed something

9      from Canada.  So it's a very convoluted process.  I'm not very

10     hopeful --

11             THE COURT:  You can't trust those Canadians.

12             MS. FERKO:  I'm not hopeful.  I mean, we might be able

13     to get someone to go to the uncle, if the uncle hasn't

14     destroyed the letter or sent it to his parents.  I don't know.

15     We do have a photograph of it.

16             THE COURT:  Have the FBI call the same person they

17     called to tell them to kill his visa and ask them if they can

18     get a clear copy of the letter and anything else.

19             MS. FERKO:  It's a different level, Your Honor.

20             THE COURT:  Do something.  Don't keep talking about

21     "you are fixin' to send."

22                     You have known about his stay in Australia since

23     when?

24             MS. FERKO:  Since October 2014.  We found out -- we

25     were told -- the FBI found out about SRG, and that

1  investigation began in March of 2014.  They were trying to

2  figure out if he was missing, where he traveled.  The family

3  didn't know much.  They started doing search warrants for all

4  of his information.  They figured out he had a Facebook

5  account.  When they got the return from Facebook, that was the

6  end of August, early September, 10,000 pages.  Went through it.

7  By October, they sent a lead to Houston stating that this guy,

8  Asher Khan, you need to look at.

9           THE COURT:  What else is on SRG's Facebook account?

10          MS. FERKO:  His Facebook account -- Your Honor, one of

11  the things I mentioned in the motion to consider is that, you

12  know, he traveled over there.  While he was over there and

13  still alive, he would Facebook back his friends and say, "Come

14  join me, come with me, come fight with me," himself being a

15  recruiter.

16           To his credit, all of his friends are saying,

17  "You know what, dude?  I think you are out there.  I'm very

18  happy being in America.  I don't have the same feelings you

19  do."  You know, but we went and followed up and interviewed all

20  those individuals, and that was what -- if they had talked to

21  him on a different media, because it is not just Facebook.

22  This is social media stuff.  There is Kik.  There's WhatsApp.

23  There's Snapchat.  There's all this stuff that the FBI -- we

24  don't have eyes into.  Facebook is, fortunately for us,

25  something that is easy for us.  So we are limited, Your Honor,

 1    as far as --

 2            THE COURT:  You can subpoena it?

 3            MS. FERKO:  I can't.  I can't get it for Kik.  Kik is

 4    Canadian.  They don't work with us.

 5            THE COURT:  That's probably Snowden's outfit.  He has

 6    got to do something.  You can ask Mountings to do it.  You

 7    would need another MLAT, wouldn't you?

 8            MS. FERKO:  Yes, I would, Your Honor.  They won't let

 9    me do much, Your Honor.

10            THE COURT:  There is not much going on in Canada.

11    Send him an MLAT.

12            MS. FERKO:  What about Ottawa?

13            THE COURT:  Some nut shot some people.  He may have

14    said he was with ISIS, but do you know of any connection

15    between any organization -- that's like saying every redneck

16    racist is part of a conspiracy.  They can't spell it.

17            MS. FERKO:  Your Honor, ISIS is something -- I don't

18    think our country has seen this before.

19        *(Off the record discussion held)*

20            MS. FERKO:  This group publicly beheaded two American

21    journalists on television and put a movie out.

22            THE COURT:  The Americans went into territory they

23    controlled.  No.  An American who voluntarily subjects himself

24    to the authority of beheading theological fanatical murderers,

25    that is not against America anymore than somebody who robs you

1   in Paris.

2          MS. FERKO:  Your Honor --

3          THE COURT:  That's not a threat against America.

4          MS. FERKO:  The threat to America now is the call from

5   ISIS is, "If you can't come here, do something in your place."

6          THE COURT:  I can't understand that and you can't

7   generalize that to everybody who says "ISIS."  That was the

8   call of the communist actually all along because they were

9   spying during the war and stuff, from the Revolution on.

10          MS. FERKO:  Your Honor, communism wasn't attached to a

11   seeking of martyrdom.

12          THE COURT:  No.  Well, it was, the martyrdom of the

13   proletarian dictatorship.

14          MS. FERKO:  But not of people.

15          MR. MARTINEZ:  I think the difference is this, whether

16   we agreed with what happened in Crawford or not, it does not

17   make a difference, but ISIS has ordered its soldiers in the

18   United States to start attacking people there.  Those two

19   people who went from Arizona to Crawford to attack those

20   cartoon jars --

21          THE COURT:  That's not the example she used.  She used

22   two people who went over there voluntarily to expose them to

23   the world, or whatever, and they got beheaded.  That happens to

24   people who go jump -- you can't blame that on ISIS.  ISIS is

25   just staying home tending to its knitting, beheading local

1    people, and then these journalists show up.  They are not

2    special.  They don't have some --

3              MS. FERKO:  What Mr. Martinez stated was that --

4              THE COURT:  There are lots of people who go to

5    Crawford with a gun.

6              MR. MARTINEZ:  And who provide material support to an

7    organization, Your Honor, which is about to begin more attacks

8    here in the United States.

9              THE COURT:  Yes.  And you have got to get the people

10   who do the attacks and do something substantial, who plan an

11   attack.  This guy planned to leave the country.  Apparently, he

12   did leave the country and then came back.  Right?

13             MR. MARTINEZ:  He did, but the important part, Judge,

14   is that he recruited another person, SRG, who did join the

15   fray, but who was tricked into coming back because his mom was

16   allegedly dying.

17             MS. FERKO:  And, Your Honor, the motivation for

18   Mr. Khan's leaving --

19             THE COURT:  A man devoted to become a martyr would not

20   turn around --

21             MS. FERKO:  But, Your Honor, it actually makes sense

22   because his motive for going was he was going to die because

23   his parents are bad Muslims.  His parents work at Wal-Mart and

24   they sell liquor.  He doesn't take money from his parents.

25             THE COURT:  I don't believe that.

```
1              MS. FERKO:  He doesn't.

2              THE COURT:  Where does he live?

3              MS. FERKO:  He lives with his parents.

4              THE COURT:  Okay.  Stop right there.

5              MS. FERKO:  But he won't take money for school.

6              THE COURT:  Wait a minute.  Like most --

7              MS. FERKO:  These are his words.

8              THE COURT:  Ma'am, ma'am, like most religious
```
fanatics, he is a lying hypocrite.  That is actually not a
crime, at least in the District of Columbia.  He doesn't take
money?  He lives off of them.  He ate their food.  He used
their electricity.  He's a leech.  That's why I surmised that
he was living off some relative in Australia.  He is a
semi-employable, uneducated, apparently peculiarly thoughted
person, and he is looking for a way to make something out of
himself psychologically.  I brought a psychologist in.

```
17             MR. MARTINEZ:  Judge, who joined a terrorist
```
organization and who recruited a person to do the same.

```
19             THE COURT:  I don't know that he joined it.  He talked
```
about it.  Everybody who downloads -- you said in the
indictment that he downloaded their material.  You can download
anything you want to in America and you can read it and you can
believe it.  You can go visit Moscow because you are fond of
it, like Franklin Roosevelt, frankly.  Or you can do like Harry
Truman who fired Harry Dexter White from the Treasury

 1    Department because the Republicans had used it against him in

 2    politics, and they left the spy in place.

 3            MR. MARTINEZ:  Judge, this is a bit different.  It

 4    isn't like you actually sign up, you swear allegiance, you go

 5    in and you have a formal ceremony.  That isn't what ISIS does.

 6            THE COURT:  People who act spontaneously in support of

 7    things --

 8            MR. MARTINEZ:  And take overt acts to join the

 9    organization.  This is not hollering "fire" in the theater.

10    This is actually taking action, which he did, and a life is

11    lost as a result of his actions.

12            THE COURT:  If the theater is on fire, you should

13    holler "fire."

14            MR. MARTINEZ:  That's correct.  That's why I said this

15    isn't hollering "fire" in the theater.  There was a fire.  He

16    did recruit a man.  He did go to the battlefield, SRG did, and

17    he would have gone had he not been tricked.  The fact that he

18    is feebleminded or weak of spirit, or whatever, isn't what is

19    being charged.  It is that he took overt action and he actually

20    went himself to Turkey, and but for the ruse to get him home,

21    he would be there.

22            MS. FERKO:  Your Honor, his statements, when he talked

23    to SRG when he was still over there -- he offered money.  "I

24    will help you.  Tell me, whatever you need, I will send you."

25    And SRG was like, "No, no, no.  I'm good.  I have all I need.

 1    I'm with Allah."  You know, he offered.  What I'm saying is it

 2    still continued.

 3              MR. MARTINEZ:  It didn't stop.

 4              MS. FERKO:  Your Honor, he didn't come home here and

 5    say, "I made a grave mistake."  Or, "Mom, Dad, you are right,

 6    this was dumb."

 7              THE COURT:  The question is whether we can detain him

 8    for trial when he is attempting to join the Communist Party of

 9    East Germany.  They are murdering thugs.  Any doubt about that?

10              MR. MARTINEZ:  I don't think that the Communist Party

11    of East Germany issued fatwas which called for the destruction

12    of an entire country, which is the United States.  That is part

13    of their goal.

14              THE COURT:  You misremember -- of course, you are too

15    young to remember, but you misremember the Cold War and Soviet

16    propaganda before the war, after the war, during the war.  They

17    thought we all had to die, being recalcitrant, running dogs and

18    pigs through the capital of Budapest.

19              The only reason this seems more important is it's

20    now.  If your grandfather lost his job in the Depression, that

21    doesn't seem troubling.  If you got laid off for two weeks,

22    that's a tragedy.  That's present too.

23              In perspective of what is actually being done, it

24    may be illegal, but I don't think he needs to stay in prison.

25              MR. MARTINEZ:  Judge, he made an attempt after he came

```
 1    back to go back to Syria, but for the FBI's intervention --
 2              THE COURT:  He went to Australia.
 3              MR. MARTINEZ:  Which is where he went the first time.
 4              THE COURT:  I know, but not everybody who goes to
 5    Australia a second time goes on to Turkey.
 6              MR. MARTINEZ:  That was his plan, and that's what the
 7    evidence indicates.
 8              MS. FERKO:  We have evidence with an individual he
 9    spoke with and said he was going to go fight in Syria.
10              THE COURT:  We will see if that is enough to convict
11    him on, but the question is:  Does he stay in jail, awaiting
12    the conviction?
13              MR. MARTINEZ:  Judge, the standard being a very low
14    standard, more probable than not and there is really nothing --
15              MR. BERG:  The standard is the presumption of
16    innocence.
17              MR. MARTINEZ:  I'm talking about risk of flight, Tom.
18    That's what I'm talking about.  That's preponderance of the
19    evidence.
20              THE COURT:  That is drafted onto it.  There is a
21    presumption.  And a reason to require bail is to insure his
22    attendance.  Do you have his passport?
23              MS. FERKO:  Your Honor, when they searched the house,
24    they could not locate the passport.  Apparently, according to
25    pretrial services, the father has the passport.  It was one of
```

1   these things where the FBI was going to go back and ask to talk

2   to the father and find out if they had kept the passport from

3   him, preventing him from traveling.

4         THE COURT:  If you are trying to keep him from

5   traveling, why don't you go get his passport?

6         MS. FERKO:  Your Honor, we had the hearing yesterday,

7   and it would have been surrendered --

8         MR. BERG:  Judge Johnson has required that the

9   passport be brought and surrendered as a condition of his

10  release.  I told the parents, "Bring his passport, along with

11  the cash deposit which is required," and that is what they are

12  going to do.

13        MR. MARTINEZ:  Judge, talking about presumption, I

14  agree that there is presumption of innocence.  But the thing is

15  there is also a presumption, a rebuttable presumption that I

16  don't think Tom rebutted, which is that he is a risk of flight.

17  There is a rebuttable presumption that he is a risk of flight,

18  based on the charges.

19        THE COURT:  I get to decide whether it is rebutted by

20  the data.  Since Congress likes to have high sentences, that

21  presumption is applied a lot of places.

22              I haven't read the record of the hearing

23  yesterday.  That's why I wanted to get you quickly.

24              Are you meeting the parents today?

25        MR. BERG:  I guess after the air conditioning people,

1   yes, I will.

2              THE COURT:  Have they told you they are bringing the

3   money and the passport?

4              MR. BERG:  Yes.  I spoke with them last night.  Those

5   are all the things I put in motion so that I could get my AC

6   fixed.

7              THE COURT:  Is there anything else that you think is

8   important about what Judge Johnson said that I may not be aware

9   of?

10             MR. BERG:  No.  I think her conditions are

11  restrictive, but reasonably so, given the circumstances in

12  trying to address as many of the government's concerns as she

13  could, consistent with letting him out of jail.

14             THE COURT:  And I understand that his sisters and his

15  parents are in the house.  Anybody can use a cell phone.  He

16  can also mail letters.  He can call on the telephone.  The idea

17  that you can insulate anybody who is free from contact with

18  whoever he wants is just an illusion.

19             MS. FERKO:  Your Honor, the government's position on

20  that is that he could pick up his neighbor's WiFi just by

21  looking on his computer.

22             THE COURT:  Or he could tell the neighbor what he

23  wanted sent.  He sends a message, if it's in code -- nobody

24  could think -- I hope you are not eavesdropping on all the

25  neighbors.

```
 1              MS. FERKO:  No.

 2              THE COURT:  Are you sure?

 3              MS. FERKO:  Positive.

 4              THE COURT:  If you want to know what they are saying,

 5   call Snowden.

 6              MS. FERKO:  I think he's busy in Russia.

 7              MR. MARTINEZ:  Trying to break our codes.

 8              THE COURT:  I can't think of a better place for him.

 9   Can you imagine?

10              MR. MARTINEZ:  He would like to go back.

11         (Off the record discussion held)

12              THE COURT:  Are there any restrictions you think are

13   sensible that Johnson didn't put on him?

14              MS. FERKO:  Your Honor, one thing that was mentioned

15   by the defendant, he spoke up and wanted to attend mosque for

16   his prayers.  And under the religion, you don't need to go in a

17   building to pray.  He can pray in his house.

18              THE COURT:  No religion requires that.

19              MS. FERKO:  Correct, Your Honor.

20              THE COURT:  That's the artifact of the self-appointed

21   bureaucrats here on earth.

22              MS. FERKO:  So the government's position would be --

23   particularly, in the Islamic religion, you can pray whenever

24   you can.  If you can't make it, it doesn't matter.  It is not

25   like Catholics.  They make you go on Sunday and donate your
```

 1    money.  But I would say, Your Honor, that we would ask that he

 2    is not permitted to go to the mosque.

 3             THE COURT:  I thought he was confined to his house.

 4             MS. FERKO:  He is not, Your Honor.  Some of the

 5    conditions were he is allowed to go to school.  He can go to

 6    the physical building of the school and attend classes.  I'm

 7    not sure he signed up for any summer classes.

 8             THE COURT:  Is he registered?

 9             MR. BERG:  He is.

10             THE COURT:  For what?

11             MS. FERKO:  He registered online.

12             THE COURT:  Don't --

13             MS. FERKO:  Sorry.  I apologize, Your Honor.

14             MR. BERG:  He is enrolled at the University of Houston

15    Central Campus.

16             THE COURT:  For what?

17             MR. BERG:  That I can't tell you.  Some of them were

18    the online courses.  We told him he couldn't do that.  He is

19    going to have to read books like we all used to.

20             THE COURT:  You would be surprised how few online

21    courses my education included.

22             MR. BERG:  He is allowed to come to my office.  He is

23    allowed to report to pretrial.  Otherwise, he is home

24    confinement, home jail, but he may attend mosque on Fridays and

25    during Ramadan.  And that was essentially it.

1              Then the government wanted to tell him how to

2      practice his religion, which caused me some heartburn.  They

3      said he doesn't have to go to mosque.  Well, I have no

4      religion, but I don't dictate to other people how they think

5      they need to do it.  And I don't like it when the government

6      tells anybody how the government thinks that they should do it,

7      so I have issues with that.  If he thinks he needs to go to

8      mosque to practice his religion, he can do so.

9              THE COURT:  Or he can wear a headscarf.  He can

10     practice his religion exactly the same way that he would

11     practice it in jail, talk to his God.  And I don't preclude

12     Islam generally, people who do crazy things in its name any

13     more than I do Christians who shoot doctors because they

14     disagree -- I love committing murder because you disagree with

15     abortion.  That's some clear thinking there.  Or Ted Kaczynski

16     blowing up people with high tech things because he hates

17     technology.

18              The pretrial officer needs his schedule, and I

19     will look at it, but I will probably allow him to go to class.

20     We will know when he leaves and comes back.  And I know he can

21     go at the right time, skip class, but he is not supposed to do

22     that.

23              MR. BERG:  He will have his ankle bracelet so we'll

24     know if he is not in class.  He's at an active location or he's

25     not.

 1          THE COURT:  We will have to figure out where the

 2    classrooms are.  So get the schedule.  Until pretrial has it

 3    long enough for them and me to look at it, he is not to go out

 4    there.

 5               If he were allowed to go to the mosque, you

 6    wouldn't want me to pick which mosque.  There are mosques all

 7    over town.

 8          MR. BERG:  It was the one he was attending in Spring.

 9          MR. MARTINEZ:  There is one mosque, and it's the one

10    he was attending in Spring, where they would like him not to

11    come back because of his radical ideas about Islam.

12          MR. BERG:  That's their issue, if they say, "Don't

13    come in the door, we don't want you."  They just gave him an

14    award on the 25th because of his Sunday school teaching.  I got

15    the certificate.  There may be some people who are

16    uncomfortable because he has been charged, and they fear

17    repercussion from the community because it has been publicized

18    in the media, but I don't think he has done anything untoward

19    there.

20          MR. MARTINEZ:  I think all that occurred before the

21    charges.

22          THE COURT:  As a state judge, I had the occasion to

23    adjudicate a lot of corporate control issues with religious

24    institutions.  That's one problem with a freestanding church,

25    titles and who can vote, who may enter.  I'm not going to do

1    it.   If they don't want him, all they have to do is tell him

2    they don't want him.   If he comes anyway, just call the police.

3            MR. BERG:   Then he's a trespasser and he's in

4    violation of his conditions.   That's easy.

5            THE COURT:   Right.   Call the police if he violates

6    that condition and let that get handled, and I will take care

7    of it later.

8            MR. MARTINEZ:   My point was they wouldn't have to call

9    the police or anything.   It's up to them.   I agree with you.

10   If they want to have him there, fine.   If not, that's up to

11   them.

12           THE COURT:   But if they want to accept him and try to

13   heal him, that's fine by me too, but they will have to do it

14   with him not there.   They can pray for him.

15               Anything else I need to know?

16           MS. FERKO:   Your Honor, just about the no Internet, no

17   smartphone.   I mean, I think we both agree that seems

18   impossible.

19           THE COURT:   He's not to do it, but it's impossible to

20   enforce.   I don't want you to expect that you are accomplishing

21   anything by that.

22           MS. FERKO:   That was the judge's statement.   Not mine.

23           THE COURT:   It might have some affect on him, but if

24   he wants to blow up America, he will probably use a cell phone.

25           MS. FERKO:   Is there a way, Your Honor, that pretrial

 1    would have the ability, if there is some reason to suspect he

 2    is doing something on the computer, to go get the computer, to

 3    have access to them having the computers and then we can get

 4    warrants --

 5                THE COURT:  They can look at whatever they want on --

 6                MS. FERKO:  So they can check his computer and look

 7    for usage or look for whatever he may --

 8                MR. BERG:  I thought you took the computer.

 9                MS. FERKO:  I think right now we do, but, I mean,

10    typically the FBI -- we don't keep computers.  They image them

11    and give them back.

12                MR. BERG:  When they are ready to give them back, we

13    can have this discussion, if we ever get it back.  I don't

14    usually get anything back from the FBI.  We usually have to

15    file motions for the return of property.

16                THE COURT:  The government, in all of its capacity,

17    loves to take stuff to not give it back.  They do it all the

18    time.  It's other people's evidence.

19                MR. BERG:  Its capacity to seize is not the same as

20    its capacity to inventory and find it later.

21         *(Off the record discussion held)*

22                THE COURT:  All right.  So the condition is he will be

23    released when he does all of that stuff, and he can't go to

24    school until I have the schedule --

25                MR. BERG:  Until you have the schedule.

1              THE COURT:  -- with the rooms.

2              MR. MARTINEZ:  Judge, can I ask you to do one thing,

3      please?  And that would be to stay your order of release until

4      the U.S. Attorney has made a determination on whether or not to

5      appeal.

6              THE COURT:  3:00?

7              MR. MARTINEZ:  He's in Alaska right now, and I don't

8      know if I can get ahold of him.

9              THE COURT:  Did he leave somebody in charge?  You are

10     not telling me leadership is one deep over there, are you?

11             MR. MARTINEZ:  No.  I will try to get ahold of him and

12     if not, I will make the decision myself.

13             THE COURT:  It is not going to get easier or anything.

14     But if they appeal it, I will stay it.

15             MR. MARTINEZ:  Thank you, Your Honor.

16             MS. FERKO:  Thank you, Your Honor.

17             THE COURT:  Assuming you do an expedited appeal.

18             MR. MARTINEZ:  Yes, sir.

19             THE COURT:  It's one of those -- I just had you all

20     intervene three and a half years after the qui tam was filed.

21     Availa is a great guy.  He just has no control over those

22     cases.  And so I just said three and a half years.  It's

23     probably two and a half years too much in order to go ahead.

24     And, gosh, two months later, they intervene.  I had one that

25     went five years, and they said, "Well, maybe" --

 1              MR. MARTINEZ:  Your Honor, I don't know that we could

 2    actually appeal by today unless we have a written order from

 3    the Court because we wouldn't have anything to defer to.

 4              THE COURT:  The order is going to be that Johnson's

 5    detention order, or non-detention order, or whatever you call

 6    that is --

 7              MR. BERG:  Order of release.

 8              MS. FERKO:  We don't have anything from Judge Johnson.

 9              THE COURT:  There are terms except for --

10              MR. BERG:  Did you actually file anything to revoke

11    the order of release?

12              MS. FERKO:  I emailed it to you.

13              THE COURT:  Do you want mine?

14              MR. BERG:  I haven't seen it.

15              THE COURT:  It has been filed.  You can have it.

16              MR. BERG:  Motion for continued stay and revocation of

17    release order denied.  I think that's what you appealed from is

18    the denial of motion for continued stay and revocation of

19    release order.

20              THE COURT:  I thought that was the motion?

21              MR. MARTINEZ:  That's the appeal from Judge Johnson.

22              MR. BERG:  That's their appeal from Judge Johnson's

23    order.

24              MS. FERKO:  There is a proposed order there, along

25    with an attachment.

1         MR. BERG:  This is actually the original that has your

2    ink on it.  I will probably let you keep that one.

3         THE COURT:  Thanks.

4         MR. BERG:  Certainly.

5         MR. MARTINEZ:  Your Honor, we have a copy.

6         MS. FERKO:  I do have a copy.  You can have this one.

7         THE COURT:  When you do something in a hurry, bring a

8    handful of copies.

9         MR. MARTINEZ:  Your Honor, I would kindly ask for you

10   to give us 24 hours because I do have to get authorization.

11        MR. BERG:  He was arrested last week.  We spent -- we

12   had to continue it five days, until yesterday.  Then they

13   stayed it until today.

14        MS. FERKO:  Your Honor --

15        MR. BERG:  That's enough.

16        THE COURT:  Don't interrupt.

17        MS. FERKO:  I thought he was finished.

18        MR. BERG:  They should be able to anticipate that

19   occasionally they lose on these issues and be ready for it.  I

20   have to do that all the time because I lose all the time.

21        THE COURT:  That's not entirely personal.

22        MS. FERKO:  Judge, the only thing I wanted to say is

23   he had his -- he was listed at 2:00 on Wednesday.  Mr. Berg was

24   unavailable Thursday or Friday.  That's why it was set on

25   Monday and his client sat in jail until Monday was because of

1    Mr. Berg's availability.

2              THE COURT:  He is not everywhere.

3              MS. FERKO:  I understand.  I mean, he is making it

4    sound like the government pushed this --

5              THE COURT:  When did you arrest him?

6              MS. FERKO:  He was arrested on Tuesday, Your Honor,

7    and he was in court Wednesday and we were ready to go, and we

8    said we could do the hearing on Thursday.  His initial was --

9    because of the flood, his initial was moved, so we were unable

10   to get him that afternoon.

11             THE COURT:  He has been in jail.  You had a full

12   hearing before Judge Johnson.  I reviewed the order and what

13   you all told me about the proceedings down there.  And I see no

14   reason to change it except for that one little wrinkle about

15   the mosque.

16             MR. MARTINEZ:  I reurge that we need to have the time

17   to make the call to Washington to get the approval on that.

18             THE COURT:  They are back from lunch now.  It is

19   1:00 in Washington, and they are only going to work until about

20   3:30.  This is a very simple chore of administering this case.

21   The government has to learn to act.  And even if Berg took six

22   months, the question is:  How much does -- Magidson told me the

23   other day -- actually it was damp Tuesday -- somebody called

24   and said they wouldn't be there for the hearing on Tuesday or

25   Monday, whatever day it was --

1              MS. FERKO:  Oh, because of the flood?

2              THE COURT:  Because the U.S. Attorney's Office was

3    closed.  And so I called and left a voice mail for the U.S.

4    Attorney, having never gotten anybody at the reception desk.

5    And about an hour later, he walked in.  And I said, "112 people

6    and nobody is working?  We are not closed and you all shouldn't

7    be closed."

8              MS. FERKO:  I was here, Your Honor.  We weren't.

9              THE COURT:  If only half of you come in, you are

10   overstaffed on any given day.  Come and do your job.  We have a

11   good staff.  But the problem with days like that is they close

12   the schools, which is dead wrong, especially in poor

13   neighborhoods.  They should have the schools open.  They will

14   be warm in the winter and dry in the floods.  They also have

15   food, which may not exist in their homes.

16            When I drove past Hunter's Creek Elementary in

17   the Spring Branch District on my way in, there were three

18   people there, cleaning up the debris in the yard, doing some

19   odds and ends like that.  The janitors made it in.  The lowest

20   paid, lowest skilled people on the payroll made it in while the

21   principals and assistant principals and people all were sitting

22   at home watching soap operas, or whatever people do when they

23   stay home.  I think it's scary.  That's why I never stay home.

24            We got covered.  All four hearings, lawyers

25   showed up.  It helps to have a receptionist that works.  At

1    least Magidson checks his voice mail or something.

2             MR. MARTINEZ:  Can I have that 24 hours or not?

3             THE COURT:  It's a simple decision.  Decide and let me

4    know immediately so I can say -- the order will say it is

5    contingent on a no continuous appeal.

6                  Thank you.

7        *(Proceedings concluded at 12:03 p.m.)*

8                        * * * *
        *I certify that the foregoing is a correct transcript from*
9    *the record of proceedings in the above-entitled cause.*

10   *Date: June 3, 2015*

11

12                        */s/ Mayra Malone*
                    ---------------------------------------
13                       *Mayra Malone, CSR, RMR, CRR*
                        *Official Court Reporter*

14

15

16

17

18

19

20

21

22

23

24

25