1          **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE SOUTHERN DISTRICT OF TEXAS**
2                   **HOUSTON DIVISION**

3   UNITED STATES OF AMERICA      )      NO. 4:15-CR-263-1
                                  )
4                                 )
    VS.                           )      Houston, Texas
5                                 )      2:14 p.m.
                                  )
6   ASHER ABID KHAN              )      June 25, 2018

7

8
        ********************************************************
9
                            **SENTENCING**
10
            **BEFORE THE HONORABLE LYNN N. HUGHES**
11
               **UNITED STATES DISTRICT JUDGE**
12

13      ********************************************************

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16      Mr. Alamdar Hamdani
        Ms. Carolyn Ferko
17      U.S. Attorney's Office
        1000 Louisiana, Suite 2300
18      Houston, Texas  77002
        Tel:  713-567-9305
19      Email: Alamdar.hamdani@usdoj.gov
               Carolyn.ferko@usdoj.gov
20
    FOR THE DEFENDANT:
21
        Mr. David Adler
22      David Adler PC
        6750 W Loop S, Suite 120
23      Bellaire, TX 77401
        Tel:  713-666-7576
24      Email: Davidadler1@hotmail.com

25

```
1  COURT REPORTER:

2       Ms. Kathleen K. Miller, CSR, RMR, CRR
        515 Rusk, Room 8004
3       Houston, Texas  77002
        Tel:  713-250-5087
4
   Proceedings recorded by mechanical stenography.
5  Transcript produced by computer-assisted transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1
2  (Defendant present.)

3          THE COURT:  United States of America vs. Asher
4  Abid Khan.

02:14:06  5          MR. HAMDANI:  Good afternoon, Your Honor.
6  Alamdar Hamdani on behalf of the United States.

7          MS. FERKO:  Good afternoon, Your Honor.
8  Carolyn Ferko on behalf of the United States.

9          MR. ADLER:  David Adler on behalf of Mr. Khan,
02:14:19  10  who is also present in the courtroom, Your Honor.

11          THE COURT:  Mr. Hamdani, are you going to speak
12  up from back there?

13          MR. HAMDANI:  Yes, I will.  I will make sure I
14  speak into the microphone.

02:14:34  15          THE COURT:  Just move it.  Slide it across the
16  table.  You have a good voice, but it's a big room.

17          MR. HAMDANI:  Is that better?

18          THE COURT:  Much better.

19          MR. HAMDANI:  Perfect.

02:14:42  20          THE COURT:  Thank you.

21          MR. HAMDANI:  Yes, sir.

22          THE COURT:  Would you raise your right hand,
23  please, sir?

24  (Defendant sworn.)

02:14:55  25          THE DEFENDANT:  Yes, sir.

1              THE COURT:  The Court concurs in the joint

2  objection to the murder cross-reference.

3                     I didn't see this datum.  How much cash

4  was given to Garcia by you?

02:16:10  5              THE DEFENDANT:  I don't remember the exact

6  number, but it was around 200 or $300.

7              THE COURT:  Two or 300?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  See if I remember this correctly.

02:17:02  10 It's the terrorism thing, the bump for terrorism but the

11 charge itself is terrorism, so you can't -- it is like in

12 the gun possession cases Ferko used to try, and she would

13 say, well, he is convicted of possession of a firearm, but

14 he used a firearm, and you can't do that.

02:17:29  15             MR. HAMDANI:  Are you suggesting that it is

16 double counting, Judge, to apply the terrorism enhancement?

17             THE COURT:  Yes, to a crime defined as

18 terrorism.

19             MR. HAMDANI:  It is not.  Courts have routinely

02:17:40  20 said --

21             THE COURT:  Not this one.  Just give me the

22 logic.  Don't tell me what some other old people --

23             MR. HAMDANI:  Sure.

24             THE COURT:  -- with robes say.

02:17:47  25             MR. HAMDANI:  So under the guidelines, there is

1  a bump, a terrorism enhancement of three and 1.4, if the

2  crime involves a federal crime of terrorism.  Now, what

3  that means is so --

4           THE COURT:  What federal terrorism statute

02:18:02  5  doesn't get an enhancement?

6           MR. HAMDANI:  So, under 2332B(g)(5), it defines

7  what a federal crime of terrorism is.

8           THE COURT:  And is that that three-page list of

9  everything under the sun?

02:18:17  10          MR. HAMDANI:  That is right, but it doesn't

11  include for example 1001, but it does include 2339B, which

12  is what Mr. Khan pled guilty to.  Under the guidelines,

13  then the second prong the United States must show is that

14  that particular crime, right, was in furtherance of -- just

02:18:37  15  to get the words straight, to influence or affect the

16  conduct of government.  And that's, if you --

17          THE COURT:  Wait, what terrorism crime doesn't

18  do that?

19          MR. HAMDANI:  Some terrorism crimes may not do

02:18:50  20  that, Your Honor.

21          THE COURT:  Like what?

22          MR. HAMDANI:  I am not too sure.  For example,

23  if -- I'll give you an example, Your Honor.

24          THE COURT:  Okay.

02:18:57  25          MR. HAMDANI:  A violation under 18 United

1  States Code, Section 2339A is one of those listed under the

2  2332B(g)(5) list of crimes.  That is providing material

3  support to an organization that may engage in terrorism.

4  That organization may not be in the business of

02:19:17  5  influencing, or trying to coerce discovery.  Another

6  example would be --

7              THE COURT:  No, no, give me an example of

8  terrorism that does not expect to influence a government.

9              MR. HAMDANI:  Right.  So, if it involves a

02:19:36  10  crime of terrorism, so let's look at the list under 2332 --

11              THE COURT:  Just give me --

12              MR. HAMDANI:  Sure.  Assume somebody wants to

13  hijack an airplane, which is one of those listed, 18 United

14  States Code, Section 32.  That -- that hijacking of an

02:19:51  15  airplane may not be relating to coercing a government to do

16  X, Y or Z.

17              THE COURT:  Of course, most airlines are

18  government sponsored or co-owned, so that is not a good

19  example.  Try something else.

02:20:03  20              MR. HAMDANI:  Sure, Your Honor.

21              THE COURT:  And there is a specific statute

22  that addresses hijacking.  So, if it were whether it was

23  motivated to prod a government or not, if you hijack an

24  airliner, it should be addressed as the airliner hijacking

02:20:20  25  statute, and you should be punished under that statute, not

1    then call it terrorism.

2              MR. HAMDANI:  Well, Judge, under the guidelines

3    if, for example, you hijack that airplane for the purpose

4    of coercing a state to do something, then you would get the

02:20:38    5    bump; otherwise, you wouldn't get the bump.

6              So, Your Honor, there could be situations

7    but in this particular case --

8              THE COURT:  What are you going to do?

9              MR. HAMDANI:  In this particular --

02:20:45    10              THE COURT:  If somebody hijacks something, are

11    you going to charge them with hijacking an airliner or are

12    you charging them with terrorism?  Are you going to charge

13    them with hijacking, and then add the terrorism as a

14    sentencing enhancement?

02:20:57    15              MR. HAMDANI:  The last choice if there is, for

16    example, coercion of a -- of a government --

17              THE COURT:  Well, assume it's the government's

18    airplane and you ask for a million dollars.

19              MR. HAMDANI:  Then you would add the terrorism

02:21:09    20    enhancement, exactly, under the guidelines.

21              So, Your Honor, on this case, it's -- the

22    two prongs are simple.  The first prong is does it involve

23    a crime of terrorism?  Which it does.  The second prong

24    which --

02:21:21    25              THE COURT:  That is not a prong.

1       MR. HAMDANI:  -- deals with -- Your Honor,

2  under the --

3       THE COURT:  It's the same -- look, the whole

4  idea of being a terrorist is you do something that we've

02:21:35   5  called terrorism, and we keep calling -- you know, the

6  State of Texas calls terroristic threat any hostile threat

7  you make over the phone.  And they're not all terrorists.

8  Stupid, but not terrorists.

9             So, I just think that's piling on, as

02:22:07   10  reluctant as I am to use sports metaphors.

11       MR. HAMDANI:  Your Honor, every circuit court

12  has applied the terrorism enhancement when the actual crime

13  does two things:  Involves a crime of terrorism and

14  influences or coerces a government.  If those two findings

02:22:26   15  are made --

16       THE COURT:  Any government?

17       MR. HAMDANI:  Any government.

18       THE COURT:  So all of a sudden, the United

19  States is policing people who want to hurt other

02:22:37   20  governments?

21       MR. HAMDANI:  If those people fall within the

22  jurisdiction of the United States, and they're using -- and

23  they are part of a terrorist organization, yes, Your Honor.

24  So in this particular case, you know, ISIS wants to form a

02:22:51   25  worldwide caliphate.  What they want to do is form --

1          THE COURT:  So do a lot of non-ISIS people.

2          MR. HAMDANI:  That is correct.

3          THE COURT:  Okay.

4          MR. HAMDANI:  But ISIS, though, is a terrorist

02:23:02   5  organization that wants to coerce and influence

6  governments, so they subject themselves to the will of

7  ISIS.  Those governments include, for example, Syria, Iraq,

8  Europe as well as the United States.  It's been part of

9  their mission since it was formed, and was part of

02:23:18  10  al-Baghdadi's speech, the leader of ISIS.

11          THE COURT:  Wait a minute.  You're talking

12  about terrorists.  This is not the American Bar Association

13  or something.  Their targets change with rates of success

14  in some area and not some other.  They have split in half

02:23:38  15  at least three times, right?

16          MR. HAMDANI:  I don't --

17          THE COURT:  Not in half, but anyway, they have

18  split.

19          MR. HAMDANI:  One thing that is consistent

02:23:45  20  about ISIS:  It believes in the worldwide caliphate, and

21  they believe in doing this by using brutal terroristic

22  means.

23          THE COURT:  Okay.  Don't keep using

24  "terroristic."

02:23:56  25          MR. HAMDANI:  Sure, brutal.  Brutal means.  And

1  so, Your Honor --

2          THE COURT:  I think they blow up, shoot, chop,

3  drown people in places.

4          MR. HAMDANI:  Absolutely.

02:24:10  5          THE COURT:  And then they made themselves

6  into -- or had made themselves into a formidable force

7  but --

8          MR. HAMDANI:  They have.

9          THE COURT:  But they're suffering some reverses

02:24:19  10  here lately.  Some of which is by people who used to be

11  part of them.

12                  Mr. Adler.

13          MR. ADLER:  Well, I take issue with a number of

14  the government's positions:  First of all, if the statute

02:24:43  15  is interpreted to mean that there is an attempt to

16  influence any government, then conceivably somebody who was

17  trying to do harm to the government of North Korea, or as

18  is in this case, the government of Syria, countries that

19  are at war, essentially, with us, they would still be --

02:25:01  20          THE COURT:  Wouldn't that be all its leaders?

21          MR. ADLER:  I'm sorry?

22          THE COURT:  Wouldn't that be all of North Korea

23  leaders?  They're the ones destroying the country.

24          MR. ADLER:  And had the government's position

02:25:11  25  been in place and this law been in place in World War II,

1 then somebody who was fighting against Nazi Germany

2 conceivably would be trying to influence that government

3 and would be subject to a terrorism enhancement.  You know,

4 that's --

02:25:22  5          THE COURT:  Well, it is simpler.  Transiting

6 Turkey to go join ISIS probably violated Turkish law.  So,

7 were they trying to influence the government of Turkey,

8 too, by violating their laws, and sneaking through their

9 territory, and risking to get them in trouble?

02:25:39  10          MR. HAMDANI:  Your Honor, in this particular

11 case, and I am going to focus the Court on this case.  The

12 United States argues in its motions and responses as the

13 United States Government, that Mr. Khan is attempting to

14 influence when he recruits, educates, and finally delivers

02:25:55  15 Sixto Romero Garcia to ISIS as a fighter, when he himself

16 attempted to go to ISIS as a fighter.  So it's the United

17 States Government, the United States argues in this

18 particular case, which is the influencing and the coercion

19 of a government that is at issue.

02:26:07  20          THE COURT:  I take that he respectfully

21 declines to answer my question.

22          MR. ADLER:  And, Judge, further, although I

23 believe the government is correct that circuit courts have

24 approved the enhancement, that doesn't mean that district

02:26:19  25 courts don't have the power to not apply it.  That is a

1  decision that is left to this Court.

2          THE COURT:  Last week I got unreversed by the

3  Supreme Court.

4          MR. ADLER:  Must be nice.

02:26:30   5          THE COURT:  I had held that you needed a search

6  warrant for cell towers, and a circuit court -- I don't

7  remember which one -- reversed me.  It wasn't my case that

8  they took, but it was a parallel case.

9          MR. ADLER:  So this Court has the discretion to

02:26:44  10  apply the enhancement when it thinks it's appropriate or to

11  not apply it when it thinks it is not appropriate.

12  Obviously, our argument from the defense side is it is not

13  appropriate in this case.

14          THE COURT:  I think the government might

02:26:55  15  reluctantly concede that there are degrees of terrorism.

16          MR. HAMDANI:  There are degrees of terrorism.

17  Could you further give me an example?  Like somebody bombs

18  something as opposed to doing something else?

19          THE COURT:  Well, or somebody does -- bombs a

02:27:22  20  school, and another person bombs an armory.  One of those

21  strikes me as more reprehensible than the other.

22                  I am going to let you guess which one.

23          MR. ADLER:  And, Judge, I think there are

24  degrees.  If you think back to some of the anti-war

02:27:43  25  protesters during the Vietnam era in this country, there

1  were people who threw blood on a military facility.  That

2  would be considered a terrorism crime nowadays, but that is

3  different than killing someone, bombing someone.

4          THE COURT:  They also burned some buildings.

02:27:57   5          MR. ADLER:  And I am routinely faced, Judge, in

6  my practice with the federal government claiming that

7  someone who is selling counterfeit videos is somehow

8  supporting terrorism because the money is alleged to be

9  funneled back somewhere.

02:28:09   10          THE COURT:  It's because there is more funding

11  from Congress when you say "terrorism."

12          MR. ADLER:  So I think there are degrees of

13  terrorism.

14          MR. HAMDANI:  Your Honor, I think there is --

02:28:20   15          THE COURT:  Is that right?  Is buying -- buying

16  oil from an ISIS-controlled well, is that terrorism?

17          MR. HAMDANI: Those facts -- I would have to

18  look at what those facts are. Your Honor, I would say this.

19  If you are supporting ISIS and you are buying items from

02:28:37   20  ISIS, then, yes, that would be material support to ISIS

21  from a financial standpoint.  In this particular case --

22          THE COURT:  Wait a minute.  I don't -- I buy

23  stuff from all kinds of stores where I don't know who owns

24  them, don't care who owns them, and I certainly don't

02:28:51   25  support what I know to be the politics of many vendors.  I

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  want the stuff.

2              MR. HAMDANI:  The good thing about this case

3  is, Your Honor, Mr. Khan knew that he wanted to join ISIS.

4  And, in fact, when he recruited Mr. Garcia, he said, You

02:29:06  5  want to join ISIS.  Do you want to go to Iraq or Syria?  So

6  that is not an issue here.

7              THE COURT:  Who asked the question?

8              MR. HAMDANI:  Mr. Khan did, Your Honor.  And

9  then Mr. Khan then proceeded to figure out the best place

02:29:18  10  to go to.  And then after that --

11              THE COURT:  I know what he did.

12              MR. HAMDANI:  Yes, Your Honor.

13              THE COURT:  You're describing a travel agent

14  now.

02:29:26  15              MR. HAMDANI:  Your Honor, this -- if you want

16  to describe this travel agent, this travel agent also

17  delivered a fighter to ISIS.  He recruited.  So one thing

18  he did -- one thing my travel agent doesn't do is tell me,

19  for example, what ISIS is up to.

02:29:41  20              THE COURT:  Wouldn't you want to know that?

21              MR. HAMDANI:  Huh?

22              THE COURT:  Wouldn't you want to know so you

23  could go some place else?

24              MR. HAMDANI:  So what Mr. Khan did is Mr. Khan

02:29:49  25  provided Mr. Garcia with information about ISIS.  Even

1   shared videos about Anwar al-Awlaki, who is -- was one of

2   the most renowned and notorious terrorists.

3              THE COURT:  Why is it "was"?

4              MR. HAMDANI:  He was killed, Your Honor, in

02:30:05   5   2011.

6              THE COURT:  Oh.

7              MR. HAMDANI:  So Mr. Khan, what he did is he

8   educated, recruited, and then delivered, more than just a

9   travel agent would do, to ISIS and he himself was going to

02:30:16   10   join them.

11             THE COURT:  What did he deliver?

12             MR. HAMDANI:  So Mr. Garcia finally made it to

13   ISIS in August of 2014.  Prior to that, Mr. Khan met

14   Mr. Garcia at the airport in Turkey, as you know, gave him

02:30:28   15   cash, and because of a ruse came back to Houston.  But

16   didn't stop there.

17                  After he got back to Houston, he made sure

18   that Mr. Khan was able to meet up with a recruiter in

19   Turkey, Mr. Zuhbi.  Up until that point the only person

02:30:42   20   talking to Mr. Zuhbi was Mr. Khan.  Mr. Khan then made sure

21   Mr. Zuhbi met up with Mr. Garcia.  Then Mr. Zuhbi then lead

22   Mr. Garcia down into Syria.  Mr. Khan continued to

23   communicate with Mr. Garcia, encouraging him to go along.

24             THE COURT:  And Garcia communicated with him.

02:30:59   25             MR. HAMDANI:  Absolutely.

1            THE COURT:  Okay.  So, two people in the United

2   States were talking about going and joining ISIS.

3            MR. HAMDANI:  Mr. Garcia is -- Mr. Khan was in

4   the United States.  Mr. Garcia was in Syria at this point.

02:31:15   5   And Mr. Garcia was trying to make his way to ISIS.  So just

6   to kind of back it up, Judge --

7            THE COURT:  I thought Garcia was in Turkey.

8            MR. HAMDANI:  Well, he went from Turkey to

9   Syria, thanks to the help of Mr. Zuhbi, and thanks to the

02:31:28   10   help of Mr. Khan.  And then when he got --

11            THE COURT:  No.  Khan didn't have anything to

12   do with the peregrinations of Garcia after he caught a

13   flight back.

14            MR. HAMDANI:  Actually, he continued to

02:31:43   15   encourage him.

16            THE COURT:  Wait.

17            MR. HAMDANI:  Well, actually, no, Your Honor,

18   he did.  After --

19            THE COURT:  He told them where to go.

02:31:49   20            MR. HAMDANI:  After he caught a flight back, he

21   came back into Houston.  When he got back to Houston,

22   Garcia said, I don't know anybody here.  Mr. Khan then,

23   while he was back in Houston, made sure that Zuhbi got in

24   contact with Mr. Garcia so that Zuhbi could then take

02:32:06   25   Mr. Garcia to ISIS.  So when he got back to Houston, he did

1  that.

2          In addition, he continued to communicate

3  with him, and even in July --

4          THE COURT:  Wait.  Communicating with him is

02:32:16  5  not a crime.

6          MR. HAMDANI:  Continuing --

7          THE COURT:  So be specific.

8          MR. HAMDANI:  Sure.  So when he communicated

9  with him, he said, I -- you should still try to get to

02:32:25  10  ISIS.  I encourage you to get to ISIS.

11          In July of 2014, July 1st, two days after

12  Baghdadi announced the caliphate, the leader of ISIS,

13  Mr. Khan, still a big supporter of ISIS, made sure that

14  Garcia knew about that, and then shared that and shared the

02:32:42  15  speech of Baghdadi with others.

16          THE COURT:  I'm sorry.  You're talking about

17  sharing press releases and speeches.  That cannot be

18  terrorism.

19          MR. HAMDANI:  So, Your Honor, it's -- all of

02:32:57  20  it, it's all part of the -- his -- it is all part of the

21  provision of Mr. Garcia.

22          THE COURT:  No.  You're telling me

23  emphatically, indignantly, that this man who stands here

24  kept chatting with his friend about what was going on.

02:33:16  25          MR. HAMDANI:  Before -- after he had already

 1  helped him make sure he got his --

 2                THE COURT:  No, I know what he had already

 3  done.

 4                MR. HAMDANI:  Okay.

 5                THE COURT:  But you can't pile everything that

 6  happens after he makes a really awful choice --

 7                MR. HAMDANI:  Uh-huh.

 8                THE COURT:  -- and say it adds to it.  No.

 9  Those post-separation conversations do not say anything

10  that is actionable.

11                MR. HAMDANI:  Beyond, of course, the provision

12  of Mr. Zuhbi to Mr. Garcia.  That happened post-separation.

13  So post-separation he gets back and Mr. Garcia can't get to

14  ISIS without Mr. Zuhbi.  It was Mr. Khan's doing and

15  introduction that said, here he is.  Here is your guy.  He

16  even told his friends -- he even told a friend of his, he

17  found the guy.  Which was Mr. Zuhbi.  And so that was while

18  he was back in separation -- back in Houston and

19  post-separation, Your Honor.

20                THE COURT:  And that's simply carrying out what

21  they jointly intended to do before Khan abruptly abandoned

22  his friend in Turkey.  Don't you agree?

23                MR. ADLER:  Yes, Judge, I do agree.

24                I think what the government is omitting

25  from its discussion is that these were two 19-year-old

1   young men.  If Mr. -- if Sixto, Mr. Garcia, was convinced

2   to do this by Mr. Khan, then the Court should also

3   recognize that Mr. Khan was convinced to do this by someone

4   else also.

02:34:41   5        You can't have one of these -- I mean no

6   offense to the memory of Mr. Garcia.  I did not know him.

7   I know he was a friend of my client's, but I mean no insult

8   to him at all.  But I think both of these gentlemen to some

9   degree were naive and stupid and foolish, and --

02:34:55   10        THE COURT:  That is the starting point, and

11   they lose ground after that.

12        MR. ADLER:  Correct, Your Honor.  Correct, Your

13   Honor.  But I don't think it is fair to paint Mr. Garcia as

14   a victim unless Mr. Khan is also -- I am not saying

02:35:07   15   Mr. Khan is a victim.  These were 19-year-old men, young

16   men, who stupidly, naively thought this would be an

17   appropriate thing to do.  And I --

18        THE COURT:  They were bored, restless and

19   insignificant, with some testosterone.

02:35:24   20        MR. ADLER:  And so I think when the

21   government --

22        THE COURT:  Mr. Khan, don't get me wrong.

23   Those are very dangerous people.  There are not a lot of

24   octogenarian Ph.D.s joining ISIS anywhere.

02:35:39   25        THE DEFENDANT:  I understand that, Your Honor.

1           THE COURT:  All right.  I will not enhance this

2  crime, which is intrinsically terroristic by association to

3  a bunch of other things that are listed in that statute.

4           So I think that gets us to 23, 1.

02:36:09   5           MR. ADLER:  Correct, Your Honor.

6           PROBATION OFFICER:  That is correct, Your

7  Honor.

8           THE COURT:  Which is 46 to 57 months.

9           MR. HAMDANI:  Your Honor, there is also a

02:36:23   10  two-level enhancement under Section 2M5.3(b)(1)(E) which

11  the United States advocated for as well.

12           THE COURT:  What is that?

13           MR. HAMDANI:  That is -- it is a two-level

14  enhancement that says, if funds or other material support

02:36:39   15  or resources with the intent, knowledge or reason to

16  believe they are to be used to commit or assist in the

17  commission of a violent act, you're increased by two

18  levels.  The United States had in its paperwork requested

19  that those two levels be added because there is different

02:36:54   20  types of material support.  One of those was the provision

21  of Mr. Garcia to commit a violent act, so that would go up

22  to a 25, Your Honor, after the three-level adjustment.

23           THE COURT:  Do you count the 300 bucks?

24           MR. HAMDANI:  Your Honor, the --

02:37:13   25           THE COURT:  Are you counting the 300 bucks?

1          MR. HAMDANI:  No.  What I am counting is the

2   provision of Mr. Garcia to ISIS.

3          THE COURT:  Okay.  He didn't provide Garcia.

4   He helped a friend.

02:37:22    5          MR. HAMDANI:  Okay.

6          THE COURT:  He didn't own him.  It wasn't an

7   asset that he had.  So, no, that is not provisioning.

8          MR. HAMDANI:  Okay.

9          THE COURT:  Overruled.  All right.  So with

02:37:39    10   that being the case, what does the government recommend?

11          MR. HAMDANI:  Well, the United States would

12   recommend a 180-month sentence.  If the Court is asking

13   within that guideline range, the United States would

14   recommend 57, but the United States would object to the

02:37:56    15   failure -- to the failure -- to the Court's decision not

16   to -- not to enhance it at 3A1.4.

17          THE COURT:  I understand.  Mr. Adler.

18          MR. ADLER:  Thank you, Judge.  So, as we stand

19   here now, the Mr. Khan that is here before you is

02:38:24    20   strikingly different from the Mr. Khan --

21          THE COURT:  I just want to know the

22   calculations.

23          MR. ADLER:  Oh, 46 to 57 months, Your Honor.

24          THE COURT:  What do you recommend?

02:38:32    25          MR. ADLER:  I would ask that you vary below

1    that 46 months, Your Honor.

2              MR. HAMDANI:  Your Honor, may I respond to that

3    real quick?

4              THE COURT:  Hang on just a minute.  I will come

5    back to it.

6              MR. HAMDANI:  Yes, sir.

7              THE COURT:  Let's take a ten-minute recess.

8              THE CASE MANAGER:  All rise.

9    (Proceedings recessed from 2:38 to 2:51.)

10             THE COURT:  Thank you.  Please be seated.  I

11   believe he wanted to interrupt.  Yes, sir.

12             MR. HAMDANI:  Your Honor, I just wanted to get

13   the Court the 3553(a) factors that the United States would

14   consider and ask the Court to consider when determining

15   Mr. Khan's sentence.

16                  So, as the Court knows, it must give a

17   sentence that is -- that adequately punishes Mr. Khan, but

18   also sufficiently deters.  This is a case, Your Honor,

19   about somebody behind a computer recruiting and educating

20   somebody to finally go to ISIS.  ISIS -- this is how ISIS

21   gets its fighters.  It is people Mr. Khan's age behind

22   computers, using Facebook, using WhatsApp, using encryption

23   software to recruit.

24             THE COURT:  Wait a minute.  Don't make that --

25   that is how everybody talks.  Everybody in this room uses

1 cell phones and computers and everything else.  They read

2 books.

3          MR. HAMDANI:  So -- and, Your Honor, that is

4 right.  We all do that but not all of us are radicalized by

02:53:00  5 ISIS propaganda and not all of us will then seek to

6 radicalize others.

7               The United States would request that --

8          THE COURT:  There are murders and crimes in

9 this country that are provoked by religious beliefs of all

02:53:14  10 kinds, and they are provoked by anger, and romance.  They

11 are provoked by all kinds of things.  That doesn't make

12 people who sit around and talk about their grievances with

13 people either conspirators or recruiters for anybody.

14          MR. HAMDANI:  In this particular -- okay.

02:53:41  15          THE COURT:  They are acting just like everybody

16 else in the United States.  And they're some of -- I

17 suspect numbers runners recruit their people from social

18 media, although they might have to know more math than your

19 average person trolling the social media.  That's where all

02:54:04  20 kinds of people get things.

21          MR. HAMDANI:  What the United States would

22 request is that a sufficient sentence be given down such

23 that people like Mr. Khan, young men in their 20s, who are

24 disaffected, who are radicalized by ISIS, and who also want

02:54:18  25 to recruit others to go to ISIS, understand that when they

1  do that, and when they join ISIS, and when they get others

2  to join ISIS, that there is a sufficient penalty to pay for

3  that.  That is why the United States requests a 180-month

4  sentence.

02:54:31  5          In addition to that, Your Honor, I just

6  want to make clear the United States, of course, objects to

7  the Court's decision not to apply 3A1.4, as well as the

8  Court's decision not to apply the enhancement under 2M3.5,

9  the United States requested.  It makes that objection based

02:54:50  10  upon its arguments here as well as the arguments in its

11  paperwork.

12          THE COURT:  Thank you.

13          MR. HAMDANI:  Thank you, Your Honor.

14          MR. ADLER:  Judge, as I was saying, Mr. Khan --

02:55:00  15          THE COURT:  Speak up.

16          MR. ADLER:  I'm sorry.

17          THE COURT:  You can --  it's a new device.

18          MR. ADLER:  As I was saying, Your Honor, the

19  Mr. Khan that stands before you today is a very, very

02:55:10  20  different man than the younger person who was 19 at the

21  time.  He stupidly, naively and dangerously believed that

22  this was a smart thing to do.

23          I point out, or I remind the Court that

24  after Mr. Khan returned from overseas, 15 months went by

02:55:33  25  before this case was filed.  Fifteen months under which --

1 during which he was under extreme surveillance by the

2 United States government, and he did not engage in any

3 violent activity.  He left that world, essentially, behind.

4             THE COURT:  What did he do?

02:55:51    5             MR. ADLER:  When he came back?  He can address

6 that himself, Your Honor, but he has started -- he embarked

7 on his college career.

8             THE COURT:  Hopefully briefer than you will.

9             MR. ADLER:  Not hard.  He embarked on his

02:56:03   10 college career.  He worked.  He has been volunteering.  He

11 has been doing every single thing we would want a young

12 person to do.  And this is before he knew the government

13 was going to file a case on him.  Fifteen months went by.

14 That is not a short period of time.

02:56:14   15             Once the case was filed, this Court saw

16 fit to allow him to remain on bond.  Mr. Khan recognizes

17 that is extremely unusual in these kind of cases.  And for

18 the three years that this case has been pending, he has

19 continued with those things:  working, school,

02:56:29   20 volunteering.

21             He added to his activities after he came

22 back from overseas, volunteering to speak on the University

23 of Houston campus to people who might be thinking of doing

24 this same stupid dangerous thing.  He has completely turned

02:56:44   25 his life around.

1            THE COURT:  A guy in Milwaukee --

2            MR. HAMDANI:  I'm sorry?

3            THE COURT:  There is a guy in Milwaukee who

4    does that.

02:56:50   5            MR. ADLER:  Correct.  Who kind of deprograms

6    people.  Mr. Khan has done his level best to follow that

7    path now.  He tries to speak rationally and reasonably with

8    other students who suggest that this might be a smart move

9    or something that needs to be done.  He explains the

02:57:07   10   dangers.  Not just the dangers of the -- in the legal

11   community, the legal field, but he talks about -- Sixto

12   Garcia was a friend of Mr. Khan's and, again, I don't mean

13   any offense to Mr. Garcia's family, but these young men

14   were friends.  This was not something Mr. Khan did with

02:57:24   15   malice.  It was stupid.  It was incredibly stupid.

16                And, again, with all due respect to

17   Mr. Sixto, Mr. Garcia, they both were naive and made poor

18   choices.  The question now, though, for this Court is what

19   do we do with this man who has been on bond for three

02:57:42   20   years, who was here for 15 months, had completely turned

21   his life around?  And what really -- what else could we ask

22   of this person to do?

23                I recognize the government is interested

24   in deterring others from going down this path.  Mr. Khan

02:58:00   25   has the same goal as the government.  But I'll argue as

1   Mr. Khan's lawyer that even 46 months is more than is

2   sufficient to send that message of deterrence.

3                    I recognize it is a big request, Judge.

4   It is an unusual request.  But I am going to ask this Court

02:58:16  5   to sentence him to a year and a day in prison.  Mr. Khan

6   has learned the lesson that needs to be learned, and

7   sending him to prison for that period of time will send a

8   deterrent message.

9                    I point out, Judge, that you have had

02:58:31  10   other cases of this nature, where the individual perhaps

11   hasn't shown an iota of effort to change his life and turn

12   his life around and move in a positive direction, and that

13   Mr. Khan did this.  And, again, I point out at the risk of

14   repeating myself --

02:58:48  15                    THE COURT:  Do you remember how much -- have I

16   sentenced him?

17                    MR. HAMDANI:  You have.

18                    THE COURT:  What did I give him?

19                    MR. HAMDANI:  Sixteen years.  But, again, that

02:58:58  20   was a very, very different man.

21                    THE COURT:  I have too much to remember them.

22                    MR. ADLER:  And so, essentially, taking a year

23   out of Mr. Khan's life will send a message that if you do

24   this, you will pay a price.  A year is not an insubstantial

02:59:17  25   amount of time.  But I do think the guideline range of 46

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 to 57 months is more than is necessary in this case.  There

2 may be other cases when that range is appropriate.  But

3 Mr. Khan is an unusual young man.  He has made decisions

4 long before I got involved in the case, long before any

02:59:33   5 defense lawyer got in the case, he made decisions that this

6 Court really should consider.  And I know he has been

7 anxious for probably three years now to speak to the Court

8 about what happened in his life, and how -- what lead him

9 to this point.

02:59:49   10            But I do -- and, again, I recognize it is

11 a big ask.  It is unusual.  I don't routinely stand in

12 front of courts and make this kind of substantial request

13 for variance, but I do think it is appropriate in this case

14 because this is a very unusual man.  This is a very

03:00:04   15 different person than the person he was at 19.

16            THE COURT:  Given the right breaks, most young

17 people -- we have been saying men.  They are largely men.

18 But with the -- if you can get their attention and give

19 them some guidance, most of them will quit doing that

03:00:31   20 particular stupid thing.

21            MR. ADLER:  And pick another one?

22            THE COURT:  Yes.  Always do.

23            MR. ADLER:  Mr. Khan has not.  Mr. Khan has

24 not.  He has not picked another stupid thing to do, which I

03:00:44   25 think speaks volumes about him.  And I also want to point

1  out, Judge, that his emotional attitude, his mental

2  attitude is quite --  is extremely different from where he

3  was mentally back at 19.  He is not the disaffected young

4  man that he was back then.  He has a much better support

5  system now.

6             I point out all of the people who have

7  taken time out of their day to come down and show support

8  for Mr. Khan to this Court, including his employer, who has

9  offered him a job.  This -- really, Judge, this is a

10  horrible case for Mr. Garcia's family, for Mr. Khan's

11  family, for everybody involved, but I truly wish I had more

12  clients like Mr. Khan.  This is an impressive young man who

13  made a terrible mistake, has pleaded guilty to it, knows he

14  has to pay for it.  But I think a year and a day, given all

15  of the circumstances in this case, as unusual as that

16  request is, I think it is something the Court should

17  seriously consider.

18             As I said, I know Mr. Khan wants to speak.

19             THE COURT:  All right, one more thing I need to

20  say formally.  I have read Mr. Garcia's mother's letter to

21  the Court.  It bears only on her grief, and not anything

22  that he did, or you did, or anybody else did.  It's -- it's

23  sad, but not cogent.  Did you see anything in there?

24             MR. HAMDANI:  Your Honor, she lost her son as a

25  result of Mr. Khan's actions, so I do see that.  And she

1  does mention that.

2              THE COURT:  She lost her son.

3              MR. HAMDANI:  She also mentions that it was

4  because of Mr. Khan.

03:02:20   5              THE COURT:  I know.  And I am not taking a

6  bereaved mother's description of causation.  What she said

7  is, in essence, in two long pages, that she's very sorry

8  her boy is dead, if he is dead.  He's gone.  Whatever it

9  is.

03:02:41  10              All right.  Mr. Khan.

11              THE DEFENDANT:  Yes, Your Honor.  I knew I

12  would get really nervous, so I wrote my thoughts down, if

13  you don't mind.

14              THE COURT:  I don't mind.  Or I'll read it and

03:02:55  15  file it if you prefer.

16              THE DEFENDANT:  I think I can --

17              MR. ADLER:  He wants to address them.

18              THE DEFENDANT:  I got arrested about three

19  years ago, and 15 months after I had returned from Turkey.

03:03:05  20  While I was in Australia, the completely new environment

21  and the distance from family and friends was causing me to

22  be depressed.  At the same time the atrocities carried out

23  by the Syrian dictator had intensified.

24              Every day scrolling through my Facebook I

03:03:21  25  would come across pictures of little children dead and

buried under the ruble.  I was 19 years old at the time.
Over the course of a couple of months, I got very emotional
about this whole situation, and learned that everyone on
the ground opposing the Syrian dictator began to fight one
another because of something or another.

Through this vacuum, the propaganda poised
by ISIS became appealing.  They opposed to the dictator
while calling for the concept of the caliphate.  To me this
call was a means to end instability, hatred and division in
the Middle East.  I genuinely thought that going there to
help would be a solution to the problems in the region.

I realize now how ridiculous and
completely naive of an idea that was.  I told my friend
Sixto that I wanted to go there, and he immediately
expressed a desire to as well.  However, shortly after I
had initiated my travel, I realized that I had made a very
impulsive and stupid decision.

Within ten minutes after the plane took
off from Australia, after coming across ISIS propaganda, I
wouldn't believe -- I wouldn't believe that all the
gruesome videos filmed by ISIS were real.  I thought either
this was done by others on a green screen, or it was done
by other groups to try and smear ISIS.

It wasn't until after I had come back to
Houston and finally saw them claim responsibility for

1  multiple suicide bombings and other attacks that I realized

2  the reality of their nature, and I wish I hadn't been so

3  close-minded then.

4              Your Honor, with all due respect, I would

03:05:00   5  like to turn around and address the family of Sixto if you

6  wouldn't mind.

7              THE COURT:  You may.

8              THE DEFENDANT:  Sixto's family -- I cannot

9  imagine what you have gone through the past few years.  I

03:05:15  10  am deeply sorry that things happened the way that they did,

11  and for whatever I may have done to facilitate it.  Sixto

12  was my friend, and I miss him so much.  I feel regret.  I

13  feel regret every day, and this is something I have to live

14  with for the rest of my life.

03:05:31  15             We were both a victim of the same

16  propaganda, and I know I can't go back to change what has

17  happened.  But I hope to do whatever I can to prevent

18  anyone else from making the same mistake.  I hope you can

19  find it in your heart to forgive me.

03:05:46  20             Your Honor, I want to make it

21  unequivocally clear that I never condoned any act in which

22  innocent civilians or people from this country died.  In

23  fact, I despise such acts.  My anger and hatred was towards

24  the Syrian dictator.  I considered this my country and I

03:06:04  25  considered myself an American.

1          It is true, Your Honor, that I expressed

2 discomfort in living here.  I think it is because of my

3 lack of understanding with my parents at the time, and my

4 constant exposure to two different cultures that I was

03:06:18  5 expected to practice simultaneously.  I was expected to

6 live up -- to live up to Pakistani culture when I was at

7 home and with relatives, and completely different culture

8 when I was at school and with my friends.

9          This lead me to be depressed and feel

03:06:32 10 alienated from both friends and family.  I didn't know

11 where to go for answers or counseling and, unfortunately, I

12 turned to the Internet for answers.

13          None of this is a justification for what I

14 did.  I did get caught into ISIS propaganda and I did

03:06:46 15 forward it to Sixto.  While in Houston I realized the rash

16 decision I made, and I am so grateful to my parents for

17 doing whatever they could to try and my bring me back.  I

18 feel regret every day because of that decision, and I

19 cannot find words to describe and express my regret,

03:07:01 20 remorse, and frustration at my decision.  When I read my

21 old text messages, I can't believe how stupid and ignorant

22 I was.  And my emotions took ahold of me, and I acted

23 impulsively.

24          I realize I cannot go back in time to undo

03:07:19 25 what I have done, and I only have the future to look at

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1   from here.  I plan to complete my engineering degree, join

2   the workforce, and resume my volunteer work.  I look

3   forward to starting a family of my own and using my

4   experiences to counsel and mentor youth who feel alienated

03:07:37   5   and depressed and who may feel same -- who may be feeling

6   the same frustration that I felt about the atrocities of

7   the Syrian dictator, with the hope of preventing even one

8   person from making the same mistake I made.

9                 Thank you, Your Honor, for giving me the

03:07:53   10   opportunity to speak and express my remorse.

11                 THE COURT:  Mr. Khan, do you see a flaw in the

12   logic that ISIS is going to impose a caliphate on everybody

13   to end disagreement?  That's ending disagreement by kill

14   everybody who disagrees with you.  That is hardly

03:08:17   15   persuasion.

16                 Now, you know there's the Sunnis and

17   Shiite division in much of central Asia.  You know, Europe

18   spent at least 30 years at a minimum at wars between

19   Protestants and Catholics, and then Protestants and

03:08:38   20   Protestants just to be ecumenical.  But we have gotten

21   beyond that.  To revert to anything that smacks of that

22   should be abhorrent.  You have seen the blessings of

23   liberty.

24                 THE DEFENDANT:  Yes, Your Honor, I have.

03:08:57   25                 THE COURT:  And Assad, apparently, is not my

1  kind of ruler.  But I am pretty certain that many of the

2  competing groups, I don't know that they would be any

3  better.  They would be different in perspective, but very

4  much the same in process.

03:09:20  5           Impulses are not good ideas.  Easy answers

6  are always wrong, always.  There is no shortcut to

7  substance, respect; and honor doesn't involve killing

8  somebody.

9           All right.  I find the guideline range is

03:10:03  10  23/16, 46 to 57 months.

11           Your crime was helping a friend do what

12  you were doing, not sending him anywhere, but two young men

13  decided they found a shortcut to fame and fortune.  They

14  began their journey into virtual certain death and you

03:11:01  15  balked on hearing that your mother was ill and returned.

16  And, unfortunately, what you did do was a federal crime

17  with a properly ugly label.

18           I think I have gotten the dates -- the

19  time from his return from Turkey to his arrest was 17

03:11:44  20  months?

21           MR. HAMDANI:  He came back in February of 2014,

22  was arrested in May, so be 15 months.

23           THE COURT:  Fifteen.

24           MR. HAMDANI:  Your Honor, real quick, just --

03:11:53  25           THE COURT:  Yes, sir.

1          MR. HAMDANI:  -- just to clarify the record.

2   He continued to text friends after he got back, telling

3   them to keep an open mind about ISIS.  And in July, five

4   months after he returned, he even posted or shared

03:12:09   5   Baghdadi's speech, ISIS's leader's speech, with a friend,

6   and even a few days after he returned he was still

7   fundraising to Mr. Zuhbi.  So, when he returned --

8          THE COURT:  How much funds did he raise?

9          MR. HAMDANI:  I have no idea, Your Honor.  But

03:12:23   10  he posted something on Facebook about telling people to

11  support Mr. Zuhbi.  So even after he returned, he was still

12  supportive of ISIS and proposed other people to be as well.

13  Thank you.

14          MR. ADLER:  And, Judge, I didn't mean to state

03:12:37   15  or imply that the minute he got on the plane he changed his

16  mind; but once he was back, he began to realize the errors

17  of his ways, and began to mature, and recognize that there

18  are much better ways to live his life than what he had been

19  involved in.  So I dispute what Mr. Hamdani is saying.

03:12:55   20         THE COURT:  And one may speak favorably of ISIS

21  in this country.  As you probably don't remember, but in

22  the other guy, the government kept wanting to talk about

23  the fact he had an ISIS flag in his closet.  ISIS flags are

24  not illegal in this country.  Even in Europe where they

03:13:17   25  outlawed any Nazi symbol that is being awfully --

1              MR. HAMDANI:  I am not saying it is illegal,

2  Your Honor, I am saying it's an indicia of where his mind

3  was.

4              THE COURT:  It's an indicia that his recovery

03:13:32   5  from adolescence was incomplete.  Mr. Khan, what you were

6  proposing to do was go over and help a really awful group

7  of people.  And no matter how nobly you construed getting

8  rid of Assad would have been, if you have to behead

9  civilians to get Assad, aren't you worse than Assad or

03:14:07  10  equal to him?

11              THE DEFENDANT:  I completely realize that, Your

12  Honor.  So, I -- I --

13              THE COURT:  But, you know, burning people at

14  the stake in Massachusetts or the town square of Florence,

03:14:23  15  which gives you different sides of Christianity --

16  actually, they hanged all the women in Massachusetts --

17  that type behavior is not ethnically specific.  It's

18  insanity.  When you start believing press releases that are

19  unverifiable, regardless of which book they come from, or

03:14:51  20  which station they come from, the result is going to be

21  something bad.

22              Voltaire, who was very smart for a

23  Frenchman, said, "If we believe in absurdities, we will

24  commit atrocities."  So the first step was you didn't think

03:15:17  25  through getting rid of Assad.  And you didn't go out and

1  raise funds for relief organizations that were feeding the

2  people in the starving parts of Syria.  You were looking

3  for that very elusive glory.  There is no glory in doing

4  things wrong even if you do them very well.

03:16:00  5             Anything else you want to tell me?

6             THE DEFENDANT:  When I think back -- or when I

7  try to think back of my thought process, all -- all that I

8  can think of is that I was completely blinded by -- by what

9  these people were putting out; and, honestly speaking, I

03:16:24  10  didn't even think of the steps to get to the goal of

11  getting rid of Assad.  And as you mentioned, that is

12  insanity, and --

13             THE COURT:  And when you see a picture on the

14  television of a baby lying under rubble, you have no idea

03:16:38  15  who put her there, do you?  ISIS says, Assad did it.  Assad

16  says that President Obama did it.  President Obama says

17  somebody else did it.

18             It's near chaos, and even if -- there are

19  going to be collateral damage if there is armed conflict.

03:17:07  20  It's not an exact science.  So even if Belgian and Canadian

21  Marines, two reasonably innocent groups of people, decided

22  to go get rid of Assad, it would be messy.

23             THE DEFENDANT:  I understand that, Your Honor.

24             THE COURT:  Terrorism in the more historic

03:17:39  25  sense, not necessarily a legalistic sense, has done awful

1  things to the United States and abroad.  We had people

2  setting off bombs on Wall Street in 1920, I believe, 1919,

3  1920, killing a great number of people.  I don't remember

4  when the Haymarket Riot in Chicago was, but the same thing.

03:18:15  5  And we have had some shootings in Fort Hood that seem to

6  have been related.  We have had some shootings in

7  Arlington, Virginia which were not tied to anything, but

8  clearly there was some insanity going on.

9            Even if you're only one less person saying

03:18:42  10  it sounds like a good idea, that is a good thing.  I don't

11  think we need to lock you up for 15 years, and I have been

12  pleased with your progress while you have been under

13  my care.  You would be surprised that some people don't

14  take that as a hint.

03:19:11  15            Mr. Khan, I sentence you to 18 months in

16  the custody of the Attorney General, three years of

17  supervised release, no fine, no restitution, $100 tax.

18            MR. HAMDANI:  The United States would ask for a

19  lifetime supervised release, Your Honor, and reconsider the

03:19:33  20  three years.

21            MR. ADLER:  For the record, Your Honor --

22            THE COURT:  Are we triggered -- do we trigger

23  that?

24            MR. HAMDANI:  We do, Your Honor.

03:19:51  25            MS. FERKO:  We do, Your Honor.

1          THE COURT:  Under which one?

2          MR. ADLER:  Judge, I don't agree that a

3  lifetime of supervised release is triggered by any of the

4  statutes in this case.

03:20:23    5          MR. HAMDANI:  I am looking.

6          MR. ADLER:  And I don't believe it is warranted

7  either, but I don't -- certainly the PSR doesn't say it is

8  triggered.

9          THE COURT:  No.  We didn't pick it up.

03:20:33   10          MR. ADLER:  It is page 16 of the PSR,

11  paragraphs 77 through 79.

12          THE COURT:  I know.  That's what I said.  We

13  came up with the customary progression.

14          MR. ADLER:  All of those paragraphs indicate up

03:20:46   15  to three years, Your Honor.

16          PROBATION OFFICER:  Your Honor, I note the plea

17  agreement does indicate that the defendant can receive up

18  to life supervised release.

19          THE COURT:  But that's a warning.  That's

03:21:08   20  not -- I am happy -- would be happy to consider longer on

21  supervised release if I thought it was proper, technically

22  proper.

23          MR. HAMDANI:  3559A(3), Your Honor.

24          THE COURT:  Pardon?

03:21:33   25          MR. HAMDANI:  It's 18 USC 3559A(3) and 3583J.

1          THE COURT:  What does it say?

2          MR. HAMDANI:  Looking it up right now, Your

3 Honor.  Thank you.  "Supervised release terms for terrorism

4 predicates - notwithstanding Subsection (b), the authorized

03:21:52   5 term of supervised release for any offense listed under

6 Section 2332b(g)(5)(B)" -- which is that big long list --

7 "is any term of years or life."

8          MR. ADLER:  So, I haven't looked at that,

9 Judge, but assuming Mr. Hamdani read it correctly, it means

03:22:07  10 the Court has discretion of imposing up to life.

11          MR. HAMDANI:  Absolutely.

12          THE COURT:  Oh, no, it doesn't mean life.  It

13 means up to life.

14          MR. HAMDANI:  Absolutely.

03:22:15  15          MS. FERKO:  Right.

16          THE COURT:  So I asked them -- assuming that is

17 right, it is hard to keep all these notwithstanding

18 anything in section... and overriding section, and all of

19 that.  I do think that five years of supervised release

03:22:36  20 would be better for him.

21          MR. ADLER:  No objection, Your Honor.

22          THE COURT:  Do you have any questions?

23          THE DEFENDANT:  No, Your Honor.  Thank you.

24          THE CASE MANAGER:  Is he going to pay the

03:22:50  25 supervised release?

1              THE COURT:  Does the government move to remit

2  the --

3              MR. HAMDANI:  The $100?

4              THE COURT:  -- $100?

03:22:57  5              MR. HAMDANI:  It does.

6              THE COURT:  Thank you.  It's a tax on being a

7  crook, and it costs more to collect the $100 than we get,

8  when we seldom get it, for most people.

9              PROBATION OFFICER:  Your Honor, for -- based on

03:23:13  10  this discussion, the probation office would ask to correct

11  the face sheet in paragraph 77 to reflect that up to life

12  supervised release was available.

13              MR. ADLER:  No objection.

14              THE COURT:  No objection from Mr. Khan, and

03:23:29  15  thank you.

16              You have the right to appeal.  You have

17  the right to appeal without paying costs, and having a

18  lawyer appointed for you if you can't afford them.

19              And that's, of course, as the fine print

03:23:53  20  on the text says, whatever you said in the plea agreement

21  controls.

22              Did you understand it?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  And I propose to let him remain on

03:24:16  25  bond.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. HAMDANI:  United States requests the bond

2   be revoked and he immediately begin serving his time.

3          THE COURT:  Well, the trouble is, we don't have

4   any place to put him for a moment.  So in a couple of

03:24:28   5   weeks, or two -- anywhere, two to six weeks, we will have

6   some place.  Have to go drive halfway to Dallas to find

7   some place to store him.

8               Do you have any questions, sir?

9          THE DEFENDANT:  No, Your Honor.

03:24:47  10          THE COURT:  All right.  Well, it looks to me

11  like you have got potential.  But in the '70s, people, not

12  grownup people, but people, started saying they needed to

13  find themselves.  I never had any trouble with that.  I am

14  right there.  The trouble is what they want to do is make

03:25:11  15  something of themselves, and the "make" is work.  You

16  figure out something responsible to make yourself into, and

17  then you go to work.  It always won't be as rewarding as

18  you expected or there will be things that get in your way,

19  then keep thinking and keep working because there are no

03:25:35  20  shortcuts.  There are no easy answers.  Be careful what you

21  believe.

22               Any questions?

23          THE DEFENDANT:  No.  Thank you, Your Honor.

24          MR. HAMDANI:  Judge, real quick before we go, a

03:25:49  25  housekeeping matter.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1           THE COURT:  Yes.

2           MR. HAMDANI:  We have under the plea agreement,

3 the United States moves to --

4           THE COURT:  Does what?

03:25:56    5           MR. HAMDANI:  Under the plea agreement, the

6 United States moves to dismiss the remaining counts only

7 against Mr. Khan, as he pled guilty to Count 6.  As to the

8 remaining counts against Mr. Khan, the United States would

9 move to dismiss it pursuant to the plea agreement.

03:26:11   10           THE COURT:  All right.  Mr. Hamdani, do we have

11 a co-defendant yet?

12           MR. HAMDANI:  He is still at large.

13           THE COURT:  Does it have to remain on my

14 docket?

03:26:22   15           THE CASE MANAGER:  It will remain on your

16 docket, but what I did is terminated the motion, then

17 dismiss it without prejudice as to refiling.  So when we do

18 get him, then they will refile the motions because there

19 were pending motions.

03:26:37   20           THE COURT:  Oh, all the pending motions other

21 than as they apply to him have been terminated without

22 prejudice.

23           MR. HAMDANI:  That is right, Your Honor.  Yeah.

24           THE COURT:  Otherwise, once a month I get to

03:26:49   25 look at them.

```
 1              MR. HAMDANI:  Don't have to.

 2              THE COURT:  All right.  Anything else, anybody?

 3              MR. ADLER:  No, Your Honor.

 4              MR. HAMDANI:  Nothing further from the United

 5  States.

 6              THE COURT:  Work hard; fly right.  Got it?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  We're adjourned.

 9  (Recessed at 3:26 p.m.)

10                    COURT REPORTER'S CERTIFICATE

11

12      I, Kathleen K. Miller, certify that the foregoing is a

13  correct transcript from the record of proceedings in the

14  above-entitled matter.

15

16                                /s/_____
    DATE: July 5, 2018           Kathleen K. Miller, RPR, RMR, CRR
17

18

19

20

21

22

23

24

25
```

03:26:59