1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3

4    UNITED STATES OF AMERICA     .    4:15-CR-00263

5    VERSUS                       .    HOUSTON, TEXAS

6    ASHER ABID KHAN              .    DECEMBER 13, 2019

7    . . . . . . . . . . . . . .       1:42 P.M.

8

9                    TRANSCRIPT OF RESENTENCING
                BEFORE THE HONORABLE LYNN N. HUGHES
10                UNITED STATES DISTRICT JUDGE

11

12

13                         *APPEARANCES*

14

15

16   FOR THE GOVERNMENT:

17        Carolyn Ferko and Anna Kalluri
          Assistant United States Attorneys
18        1000 Louisiana
          Suite 2300
19        Houston, Texas   77002

20

21   FOR THE DEFENDANT:

22        David Adler
          DAVID ADLER PC
23        6750 West Loop South
          Suite 120
24        Bellaire, Texas   77401

25

2

1                          *APPEARANCES - CONTINUED*

2

3

    OFFICIAL COURT REPORTER:
4

5          Mayra Malone, CSR, RMR, CRR
           U.S. Courthouse
6          515 Rusk, Room 8004
           Houston, Texas  77002

7

8   Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
9

10                              - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***PROCEEDINGS***

THE COURT:  Where is your client?

MR. ADLER:  He's here.

THE COURT:  You don't want him to sit with you?

MR. ADLER:  He didn't want to sit with me, Your Honor.

THE COURT:  Our nation has struggled with terror, whether the Islamic terrorists of today or the Southern Separatists in 1861, which caused about 700,000 deaths; the Haymarket bombing in Chicago in 1886, killing seven policemen and four civilians; the Wall Street bombing of 1920, 38 people dead; a Puerto Rican separatist group shooting five members of Congress from the Visitors Gallery of the House of Representatives; Timothy McVeigh's bombing of Oklahoma City in 1995, leaving 168 people dead; and, of course, most recently, the bombing of the World Trade Tower with 2,726 deaths.

In the same class, we have had four presidents assassinated:  Lincoln, Garfield, McKinley and Kennedy.  We have had several known attempted assassinations:  Andrew Jackson, who apparently was stubborn enough that the bullet went in a different direction after meeting him; Franklin Roosevelt, the gunman missed, and they got the mayor of Chicago; Truman, they tried to force the front door of the Blair House where the Trumans were living while the White House was refurbished.  Kind and gentle Gerald Ford had two people shoot at him that we caught, and, of course, Ronald Reagan,

13:44      1    leaving a speech.

           2             We have survived these attacks on us and our

           3    government.  We have thrived despite them because we have the

           4    rule of law.  Our Constitution cabins government, the only way

13:44      5    to protect freedom.  It is a complex system.  It has

           6    presumptions of innocence, public courts, a ban on cruel and

           7    unusual punishment, and critically we banned arbitrary

           8    government.  It has to under the Constitution work through

           9    reason, not through anger or power.  Our justice serves a

13:45     10    narrow list of goals.  It does not serve revenge.

          11             We are here to resentence Mr. Khan.  I have read

          12    a whole lot.

          13             Ms. Ferko, is there anything in particular you

          14    would like to add?

13:45     15         MS. FERKO:  No, Your Honor.  Well, Your Honor, counsel

          16    for the United States --

          17         THE COURT:  Would you come here so you can use the

          18    microphone without throwing your back out?

          19       *(Compliance)*

13:45     20         MS. FERKO:  Is that better?

          21         THE COURT:  Yes, ma'am.  It should be easier for you.

          22         MS. FERKO:  It's a little easier for me, Your Honor.

          23         THE COURT:  I don't expect you to be comfortable in

          24    here.

13:46     25         MS. FERKO:  We just would like to state that as far as

13:46      1   the objections to the PSR, that I do believe that Mr. Adler and

           2   the United States agrees that the terrorism enhancement should

           3   apply in the calculation of the guidelines, which is one of the

           4   reasons we are here for the resentencing.

13:46      5                    We would also agree --

           6             THE COURT:  It's the only reason we are here but --

           7             MS. FERKO:  Your Honor, we would also agree, Your

           8   Honor, that the two points was not a part of the appeal, so,

           9   therefore, that the adjusted guideline range for Mr. Khan would

13:46     10   be 38, not 40 as deemed in the original PSR.  And that's

          11   indicative of that.

          12                    Your Honor, the United States is asking for a

          13   sentence of 180 months.  We are asking for the lifetime

          14   supervision to be imposed upon Mr. Khan's release after such a

13:46     15   sentence, and we are also asking for the conditions

          16   specifically regarding the lifetime supervision that the

          17   probation office has recommended in its appendix to the PSR,

          18   which would include, Your Honor, that the defendant must not

          19   attempt to contact, communicate, interact with any form of

13:47     20   individual of any terrorist organization or especially

          21   designated global terrorist entity as designated by the United

          22   States.

          23             THE COURT:  Slow down.

          24             MS. FERKO:  Yes, Your Honor.

13:47     25             THE COURT:  Not everybody hears as fast as you can

13:47     1    talk.

          2            Must provide the probation office with access to

          3    any financial information and authorize the release of that

          4    financial information, and the probation office will share

13:47     5    that -- may share that information with the U.S. Attorney's

          6    Office and other law enforcement entities, and that the

          7    defendant shall not possess or use the computers as defined in

          8    18 USC 1030(e)(1) or electronic communications or data storage

          9    devices, media, unless approved in advance by the probation

13:48    10    officer and subject to the probation office's scrutiny and

         11    search.

         12            MS. FERKO:  Your Honor --

         13            THE COURT:  Why don't you just let Putin tell you what

         14    he is doing?

13:48    15            MS. FERKO:  Your Honor, we feel that these conditions

         16    are somewhat standard in these cases as far as the supervision

         17    is concerned.

         18            With Mr. Khan, the United States recognizes that

         19    the sentence that was initially imposed by this Court of 18

13:48    20    months, Your Honor, that's a 90 percent reduction of the

         21    recommended guideline sentence.

         22            The United States believes, based upon the facts

         23    that are in the PSR, the additional facts that have been

         24    litigated and that are in all of our memorandums that I know

13:48    25    this Court has read, Your Honor, Mr. Khan's -- he should be

13:48   1   sentenced to a sentence of 180 months.  He does not deserve

        2   the 90 percent discount which was given the first time.

        3          And at this time, I'm welcome to your questions.

        4          THE COURT:  What is the upper limit of the --

13:49   5          MS. FERKO:  The limit is 15 years, Your Honor, which

        6   is 180 months.  The actual guidelines exceed the recommendation

        7   of the maximum statutory of the sentence that Mr. Khan was

        8   facing at the time he committed these offenses.

        9          THE COURT:  I may come back to you.

13:49   10         MS. FERKO:  Yes, Your Honor.

        11         THE COURT:  Mr. Adler?

        12         MR. ADLER:  Thank you, Judge.

        13         Ms. Ferko is correct that I have not objected to

        14   the terrorism enhancement; however, that should not be

13:50   15   interpreted by this Court or anyone in attendance as a signal

        16   that I believe the terrorism enhancement is appropriate, but I

        17   do think under the current scheme of sentencing, that that

        18   enhancement should be applied.

        19         And then, as the probation officer has pointed

13:50   20   out, I think, on two occasions in the addendum, even if it is

        21   applied, the Court has discretion to sentence Mr. Khan anywhere

        22   up to the maximum sentence, and that includes reimposing the

        23   sentence that the Court previously imposed.

        24         Mr. Khan's conduct obviously was something the

13:50   25   Court considered at the first sentencing hearing, both his

13:50   1    criminal conduct and the other aspects of his life.

2              Since that last sentencing, Mr. Khan has served

3    his time in prison without disciplinary issues.  He has

4    returned to his family and friends.  He is reenrolled at the

13:51   5    University of Houston and has continued his education and is

6    continuing to work.

7              So I would ask the Court to consider -- strongly

8    consider reimposing the sentence that the Court found

9    appropriate at the last sentencing hearing because things have

13:51   10   only gotten better as far as Mr. Khan's conduct since that

11   time.

12             And I would remind the Court that Mr. Khan's --

13   some of the factors the Court should consider are Mr. Khan's

14   age at the time he committed the offense and his maturity at

13:51   15   the time he committed that offense, his family and social

16   structure.  Many of his family are here today.  Some of his

17   friends are here, as well.  In fact, I received one letter -- I

18   just want to read a little portion from it.  It is from

19   Mr. Justice Currey.

13:51   20             Mr. Currey, could you stand up for a moment just

21   to identify yourself?  Thank you.

22             Mr. Currey wrote, "My name is Justice Currey.

23   I'm a former United States Marine.  I am currently a

24   student" --

13:52   25             THE COURT:  There is no such thing as a former marine.

13:52   1                MR. ADLER:  What's that?

        2                THE COURT:  There is no such thing as a former marine.

        3     That man is a marine.

        4                MR. ADLER:  He is a -- he is no longer serving in the

13:52   5     Marine Corps at this time, Your Honor, and currently a student

        6     at Lone Star Community College.

        7                     "I'm writing in regards to my good friend Asher

        8     Khan.  I met Asher back in my early years of high school

        9     through some other friends of mine.  Right off the bat, I was

13:52  10     astonished by how kind and accepting Asher was.  Sometimes I

       11     would go to youth nights with him and my few friends at the

       12     time.  And even though I hardly knew the guy, he vouched for me

       13     and ensured I was included in everything.  Throughout the many

       14     years we spent together, he became more than just a good friend

13:52  15     but also an example of behavior and discipline.

       16                     "I mean it when I say that his respect for

       17     others, and particularly his family, made me take another look

       18     at myself.  Whenever he spoke to his parents, he did so

       19     politely and never spoke back.  When it came to his studies, he

13:53  20     was dedicated and studious.

       21                     "I say that meeting Asher has helped me to become

       22     a better person, and I hope that whoever hears this understands

       23     the type of person that Asher truly is.

       24                     "I am not the best at expressing my thoughts and

13:53  25     writing however, but if you would like any more information or

13:53   1    have any questions, feel free to contact me."

2    THE COURT:  They have a course for that.  At the

3    University of Houston, they have a course for that.

4    MR. ADLER:  For expressing oneself?

13:53   5    THE COURT:  Repository writing.

6    MR. ADLER:  I may take it after this case.

7    So his friends and family network remain strong

8    and intact.  He was working before this case began.  He has

9    worked during this case.  He worked during prison.  I filed

13:53   10   with the Court a letter from his employer at the prison where

11   he was tutoring other inmates.  I don't think I frankly in 26

12   years have ever gotten a letter from a BOP person willing to

13   vouch for an inmate.  And I have also included the letter from

14   his current employer who he continues to work for as a pizza

13:54   15   delivery person, I believe.

16   His volunteer work started before this case

17   began.  It has continued through this case and continues to

18   this day.  And it is in primarily three areas that he has been

19   volunteering; however, all three have one purpose, one goal,

13:54   20   and that is to stop anyone else from making the mistake that he

21   made.

22   He has spoken weekly at the University of Houston

23   where he and some of the other students set up a table and are

24   willing to discuss some of these issues that online extremist

13:54   25   groups use to attract young men and woman into their folds, and

13:54   1    he obviously is a voice with considerable authority about how

        2    easy it is to make a misstep and go down the wrong path.

        3             Beyond just speaking to students in person, he

        4    agreed to submit to an interview.  That is now on the Internet.

13:54   5    It is a podcast -- I submitted the link to the Court -- where

        6    he talks about how much this decision has ruined his life and

        7    how much he does not want to see anyone get suckered into this

        8    kind of propaganda.

        9             And then lastly, Judge, Mr. Khan was asked to

13:55  10    participate in a program that's actually ironically sponsored

       11    by the Department of Homeland Security in which an organization

       12    here in Houston is trying to -- well, not trying.  They have

       13    established a program where they are training the trainers.

       14    And by that, I mean they are training community leaders,

13:55  15    religious leaders, school officials, athletic coaches, all of

       16    the people that young individuals might come in contact who are

       17    being trained to look out for signs that a young person might

       18    be susceptible to either extremist propaganda or gang

       19    recruitment efforts.

13:55  20             Mr. Khan's insight into how he fell into this and

       21    how he made this terrible mistake, I was told by the

       22    individuals running this program and that are training the

       23    trainers and have created this guide, that Mr. Khan's comments

       24    were beyond invaluable; that the people now have firsthand

13:56  25    knowledge from a firsthand experienced voice as to what they

13:56   1   should be looking for.  And so when these people go out to

2   train other members of the community, the idea is that Mr. Khan

3   hopefully has played a role in stopping other people from doing

4   this, as well as other people from suffering what the victim in

13:56   5   this case, Mr. Garcia, suffered and his family has suffered.

6           The Court is aware that the Fifth Circuit

7   indicated that whatever sentence -- has indicated in a variety

8   of opinions that whatever sentence this Court imposes should be

9   justified.  Although Ms. Ferko and the government characterize

13:56   10  it as a 90 percent discount, whatever the number is, it is up

11  to this Court to decide.  The Supreme Court is clear on that,

12  and that if we are to give any weight at all to both Supreme

13  Court precedent and even the sentencing scheme that the

14  guidelines reflect, this Court has the discretion, so long as

13:57   15  it is properly justified, to sentence Mr. Khan to anything up

16  to the statutory max.  He served 18 months.  The Court felt

17  that was appropriate at the time, and, as I said, I believe it

18  is even more appropriate now, and I know Mr. Khan would again

19  like to address the Court before a decision is made.

13:57   20          THE COURT:  Certainly.

21              Mr. Khan?

22          THE DEFENDANT:  Sir, I wrote my thoughts down, if I

23  may.

24          THE COURT:  Certainly.

13:57   25          THE DEFENDANT:  Your Honor, I was released from prison

13:57    1   this past June.  Prison was nothing like I have ever

         2   experienced before.  It forced me to think about my life and

         3   the many blessings that I have.  Your Honor, I realized in

         4   prison how much I took freedom for granted.  I spent every day

13:58    5   wishing I could go back and change my decisions.  The guilt ate

         6   away at me, thinking how things would have been different if I

         7   had just thought rationally rather than emotionally and had not

         8   been so close-minded.

         9         I used my time in prison to plan how I could

13:58   10   better myself and make the most of my life when I was released.

        11   I thought about how I could productively share my experiences

        12   in hopes of deterring someone, anyone, from making the same

        13   mistakes that I made.  I realized how short life really is and

        14   nothing is worth throwing your life away for or hurting those

13:58   15   who you love and who love you.

        16         Thank you, Your Honor, for giving me the

        17   opportunity to speak.

        18         THE COURT:  Certainly.

        19         Yes, ma'am?

13:59   20         MS. FERKO:  Your Honor, the United States would just

        21   like to comment on what Mr. Adler stated and what Mr. Khan just

        22   said.  Your Honor, the United States' concern is when Mr. Khan

        23   committed this offense, he was of a young age and immature and

        24   impressionable.  Mr. Khan is still of a young age, impressible,

13:59   25   and of a concern.

13:59      1                      And while I understand that this Court may not be

           2     inclined to change the original sentence of imprisonment, the

           3     United States would stress, Your Honor, would ask for then the

           4     actual allowable lifetime supervision of Mr. Khan with those

13:59      5     conditions.

           6                 THE COURT:  He is not going to be young forever.

           7                 MS. FERKO:  I understand, Your Honor.  That can maybe

           8     be readdressed at a later point in time.

           9                      Mr. Khan in his podcast -- I have listened to

14:00     10     it -- he comments on the failings of his parents.  And the

          11     article in the Chronicle that appeared this morning when he

          12     spoke to a reporter, he comments on the fact that he wanted --

          13     he knew he was coming back, and that's essentially not true,

          14     Your Honor.  He knew his parents were tricking him.  And, Your

14:00     15     Honor, as far as the timing, whether he made a call and

          16     realized his mother was there or not, his statement to his

          17     friends that were interviewed 15 months after he returned upon

          18     his arrest stated that Mr. Khan's mother wasn't at the airport.

          19     Mr. Khan's mother was picked up at a hospital off of Beltway 8.

14:00     20     Mr. Khan himself told his friend, Mr. Zia, the next day that

          21     his parents had lied to him, and, you know, he came back for

          22     nothing and that his parents confiscated his passport.  And so

          23     he wasn't permitted --

          24                 THE COURT:  Smart parents.

14:00     25                 MS. FERKO:  It is a smart parent, Your Honor, but it

14:00   1   doesn't necessarily reflect that the defendant's action was one

2   of, I have made a mistake, as Mr. Adler says.  Mr. Khan never

3   stopped for, at least what the government can prove to this

4   Court if it was done at trial, for an eight-month period after

14:01   5   his return of propagation for ISIS and Al-Baghdadi and to

6   encourage his friends that this was the right path somehow.

7               Your Honor, while now Mr. Khan is before you

8   saying that, you know, this was a mistake and I'm telling

9   others not to do this because I don't want to go to prison, I'm

14:01   10  pretty positive Mr. Khan doesn't want to go back to prison.

11  But, Your Honor, the sentence of 18 months, again, the United

12  States believes is insufficient, and it is a 90 percent

13  discount and that Mr. Khan, while he did plead guilty, Your

14  Honor, and accepted responsibility, there is more to that than

14:01   15  just a quick sentence, a short sentence and a short time of --

16  a period of supervised release.

17               Mr. Khan is telling this Court what it wants to

18  hear, and the articles in the paper that have been written

19  about Mr. Khan, that is Mr. Khan's narrative.

14:02   20         THE COURT:  I'm sorry.  There is a whole lot of

21  government narrative in there too.

22         MS. FERKO:  There is some, Your Honor.

23         THE COURT:  There is a whole lot.

24         MS. FERKO:  But Mr. Khan's narrative is that it was,

14:02   25  you know -- Mr. Sixto died over there, and that was on him, but

14:02   1   it was at constant encouragement of Mr. Khan to go and fight

2   with ISIS and to join ISIS and I will continue to help you if

3   you need it.

4            So, Your Honor, the government is just asking you

14:02   5   to consider -- again, the sentence that we're asking for is the

6   full 480 months.  Your Honor, we are asking for that lifetime

7   period of supervision, along with those restrictions on the

8   media, on his phone, on his computers with the regulation by

9   the probation department.  And if Mr. Khan truly is who he says

14:03   10  he is and everything is going to be fine, Your Honor, then that

11  imposition shouldn't be much of one.

12           Thank you.

13       MR. ADLER:  Briefly, Judge, I hope Ms. Ferko misspoke

14  when she said she was seeking a 480-month sentence.

14:03   15       MS. FERKO:  I'm sorry.  180-month sentence.

16       THE COURT:  She is always very enthusiastic.

17       MR. ADLER:  Judge, we can go back and forth at this

18  probably ad nauseam.  I think Ms. Ferko and I, when we are long

19  retired, will probably still not agree on what the appropriate

14:03   20  sentence is, with all due respect to her.

21       THE COURT:  You each have distinct roles to play.

22       MR. ADLER:  I will just say this, Judge:  If the

23  government is presenting the idea that Mr. Khan has done these

24  volunteer efforts, given these interviews in an effort to

14:03   25  affect public opinion or the Court, I will tell the Court as an

14:03   1   officer of this Court that the reality is Mr. Khan didn't want

2   anyone to know about his efforts.  Okay.  He was very reluctant

3   to speak.  With all due respect to the media, he didn't want

4   them to know what he was doing at the University of Houston.

14:04   5   He -- his decision to get involved with the training program,

6   the City of Houston training program was -- his initial

7   response was:  Who is going to know about this?  I don't want

8   to bring more shame on my family and myself.  He did it for the

9   purest of reasons.  He truly does not want anyone to be facing

14:04   10  the government on these kind of charges.  He truly does not

11  want anyone to be facing prosecution for joining a gang.  He

12  absolutely recognizes the stupidity, the naivety that he

13  displayed back when he was 19.  He is 25 years old now, and I

14  understand that Ms. Ferko feels that that is a young

14:04   15  impressionable age.  I would point out that --

16          THE COURT:  For most of us men, 46 is still young and

17  impressionable.

18          MR. ADLER:  In the Marine Corps, Mr. Khan would be the

19  equivalent of a lieutenant or a captain at this point, so it is

14:05   20  not such a young and impressionable age perhaps as the

21  government would want you believe.  He has matured.  Prison

22  helped mature him.  His family has helped mature him.  And I

23  think all of that is demonstrated by his sincere desire and the

24  numbers of hours he has put in trying to dissuade people from

14:05   25  going down the path that he went down.  So I would ask the

14:05   1   Court to reimpose the sentence that he has served.

2                As far as the other conditions, we don't really

3   have a problem with it, frankly, Judge, with the exception of

4   the computer use, to make Mr. Khan ask the probation office

14:05   5   every time he wants to use a computer or a cell phone is going

6   to be a monumental amount of added work for the government and

7   for the probation office.  But as far as the time that he is

8   on, I think the Court can impose a reasonable amount of

9   supervised release whereby the Court certainly, and perhaps

14:06   10   even the government, would be assured that he is not that

11   19-year-old -- I almost said a word I shouldn't say in court,

12   but it begins with "dumb."

13            THE COURT:  I said that last time.  The problem with

14   dumb is it can have very dangerous consequences.

14:06   15            MR. ADLER:  No doubt, Your Honor.  But my point is I

16   think a term of supervised release can be imposed that ensures

17   everybody, if they are willing to take a fair assessment of

18   Mr. Khan, that he is not going down the road of any criminal

19   conduct for the remainder of his life.

14:06   20            THE COURT:  For guideline calculations, he gets the

21   terrorism enhancement.  There are reasons to depart downward.

22   A practice, irregular probably, that when the government brings

23   me a nine-defendant case and they want to make a deal with a

24   couple of them, I ask them to order them in significance, and

14:07   25   nobody gets a sentence higher than whoever they say is the

14:07  1    kingpin.  So if they want to let the kingpin go back to his

2    yacht after two years, then nobody goes -- there are exceptions

3    because some people have 73 earlier convictions and so that's

4    part of the offense.

14:08  5          Mr. Khan has no criminal history other than the

6    one I gave him.  He has, to the best of our knowledge here, no

7    drug use.  If he is truly a Muslim, he doesn't drink.  He

8    studied to improve his mind, and derivatively his judgment,

9    while he was in custody.  He is doing it now.  He works a very

14:08  10   distinguished profession.  Who doesn't love a pizza delivery

11   guy?  It is conceivable that his effort in dissuading students

12   from fanaticism is a front, but he is doing it, and that's

13   doing some good.

14         He was impressionable, and I hesitate to make

14:09  15   that any direct correlation with age.  He was teenage stupid

16   where he exercised abysmal judgment; however, we have to

17   consider that in light of when you use the word "terror."

18         What he did is talk about Jihadism or

19   unprincipled murder and decided that was more exciting than

14:10  20   whatever he was doing in, I guess, high school at that point.

21         I very carefully read all of the transcripts that

22   I have been afforded of communications between Garcia and

23   himself, and at the end, it's Garcia that's urging him to come

24   back, and don't go away, and this is a great deal.  So I think

14:10  25   they were equally enthusiastic about it.  But Khan, whether he

14:11   1    believed the phone call about his mother or not -- whether he

2    likes his mother or not, I don't know, but it doesn't matter.

3    He balked and left.  His material support was not through

4    crates of AK-47s or thousands of dollars, much less millions.

14:11   5    It was what money he had left over, which must not have been

6    much.  He was using some kind of prepaid card to get on the

7    flight back.

8              As terrorists go, he has to be on the low end.

9    Had he gotten there and succeeded as a terrorist, he would

14:11   10   belong higher up than he belongs here.

11             And Garcia was not recruited.  The conversations

12   make it clear they both were interested.  They both wanted to

13   do it.  They encouraged each other.  It was no different than

14   two guys signing up for the Marines, except for, of course, one

14:12   15   has a noble purpose and one has a despicable, inhumane purpose,

16   which is a big difference.

17             There is no evidence that Mr. Khan possesses any

18   talents of leadership or gunsmithing, logistics of anything

19   that might be an especially useful tool, had he ever made it.

14:13   20   And it's hard to remember at which time who is finding whom the

21   most, but some of the conversations are about supporting Iraq

22   against Syria, or Syria against the Kurds.  Everybody

23   apparently hates the Kurds.

24             He has made obvious steps toward rehabilitation.

14:13   25   The data are that four out of all of the terrorist convicts

14:14    1   have committed new crimes after serving their time.  They were

2   not necessarily -- in fact, I don't think any of the four who

3   got out went back to terrorism, did they?

4           PROBATION OFFICER:  No, Your Honor.

14:14    5           THE COURT:  Two of them in prison, at least one of

6   whom went back to trying to recruit terrorist buddies.  But now

7   I have to add that the number who have gotten out is probably

8   relatively small.

9               Is that 400 who had been released?

14:14   10           PROBATION OFFICER:  I don't know, Your Honor.

11           THE COURT:  I'm not sure whether it is 4 or 500 who

12   have been released, or just the 4 or 500 who have been

13   convicted, but those with life sentences will not be in the

14   position to do that.

14:15   15               He has got good reasons not to go back to

16   committing crime, the education he has been working on.  He has

17   friends.  And this probably won't sound right, but he has

18   friends who are not family and probably not Muslim.  And so he

19   has influences that are important to him that are unlikely to

14:15   20   be conducive to his returning to wanting to fight in the Middle

21   East.  And I am not in any way suggesting that anybody in the

22   family was doing that, but it is a breadth of support.  It's

23   hard to do much that you can say rehabilitates somebody when

24   they didn't do anything significant that you can undo.  Bought

14:16   25   a plain ticket and made some cell phone calls and then quit

14:16   1    before it started.  That's the important consideration.  That

        2    terror is cowardly and about seven other things that are

        3    disgusting and inhuman, we must make sure that we do not in our

        4    zeal to punish terrorists become more like them.

14:17   5            Somebody famous said, Choose your enemies

        6    carefully because you will become like them.

        7            His motivation was weak.  He left voluntarily and

        8    he cooperated with law enforcement.  Is that not true?

        9        MS. FERKO:  Your Honor, Mr. Khan after his guilty plea

14:17  10    did speak with law enforcement on one occasion.  I don't

       11    believe Mr. Khan had much information to provide at that point.

       12        THE COURT:  I struggle with low-end people making

       13    deals.  They don't have anything to offer.

       14        MR. ADLER:  Ms. Ferko is essentially correct.  I would

14:17  15    just add, Your Honor, that it is the defense position that it

       16    was -- the government was very reluctant to be willing to meet

       17    with Mr. Khan to hear what he had to say.  They were not very

       18    interested at the time.  Maybe that's changed.  I'm sure he is

       19    still willing to speak with them but, yes, he did meet with

14:18  20    them and answer their questions.

       21        THE COURT:  The recitation of his activities suggest

       22    that he doesn't have a lot to say.

       23            He doesn't need a lot of retribution because what

       24    he did do was so minuscule.  Yes, it could have been worse, but

14:18  25    I'm not trying him on what he could have done.  I'm trying him

14:18    1   on what he did do.

2           MS. FERKO:  Your Honor?

3           THE COURT:  Yes, ma'am.

4           MS. FERKO:  I would just say the government -- I guess

14:19    5   that's where we deviate in our view of the case in that

6   Mr. Khan --

7           THE COURT:  That has never happened to us before.

8           MS. FERKO:  I understand, Your Honor.  But, Your

9   Honor, Mr. Khan did provide -- Mr. Khan is the but-for of this

14:19   10   case.  Mr. Khan -- but for Mr. Khan, you know, Mr. Sixto

11   Ramirez wouldn't have known about how to get a passport, how to

12   get the flights.  You know, he provided all those direct links

13   --

14           THE COURT:  He helped him, but he made the decision.

14:19   15           MS. FERKO:  Sure, Your Honor.  And then once he left,

16   Your Honor, but for Mr. Khan providing Mr. Zuhbi, who is also

17   under the indictment, the smugglers' information, the

18   smugglers' WhatsApp chat name and the Facebook contact, you

19   know, Mr. Garcia wouldn't be able to do anything.  He would

14:19   20   have left.  I mean, he didn't have that information.  Mr. Khan

21   did, and Mr. Khan provided it to him.

22           THE COURT:  But not commercially.  They were friends.

23   He even gave him his money.

24           MS. FERKO:  He did, Your Honor.

14:20   25           THE COURT:  And the government says that's material

14:20   1   support.

2        MS. FERKO:  Because, Your Honor, the money was given

3   with the instructions to go join ISIS, which is the enemy of

4   our state.  I mean, so this is --

14:20   5        THE COURT:  He said he didn't have any money left.  He

6   gave him the money.  And he said later on in the conversation,

7   When I get back, if you need more money, call me.

8        MS. FERKO:  Right.

9        THE COURT:  There was nothing specific about, this is

14:20  10   for a rifle, this is for ammunition, this is --

11        MS. FERKO:  But, Your Honor, it was for the purpose

12   for Mr. Garcia to get with ISIS, to become that soldier with

13   ISIS.

14        THE COURT:  He understood that Mr. Garcia was on his

14:20  15   way to do something wrong.

16        MS. FERKO:  Yes, Your Honor, he did.

17        THE COURT:  He understood that, but he is not -- the

18   word "material" in the statute is kind of peculiar.  Does it

19   mean material in the fact that it's subject to being touched or

14:21  20   whether it is being pulled?  Or does it mean it is a

21   significant amount?  It's your statute.

22        MS. FERKO:  Right.  I think we would argue that the

23   material support that he provided was the instruction, the

24   finances, and actually the person to ISIS.  And I think that's

14:21  25   what Mr. Khan pled guilty to.

14:21    1       THE COURT:  Yes.  But the support he shared was

2    traveling with him and then giving him a phone number when he

3    bailed on him.

4               Was it Mr. Khan who was confined to the house for

14:22    5    a while and then confined to a house in the gym at the

6    University of Houston and then slowly expanding pretrial?

7       MR. ADLER:  As the Court may recall, I was not the

8    original lawyer on the case.  Mr. Berg was and he took

9    employment with the District Attorney's Office.  I don't

14:22   10    remember, but I think his conditions have generally --

11       THE COURT:  Well, ask him.

12       *(The defendants confers with his attorney)*

13       MR. ADLER:  That is correct.

14       THE COURT:  So I let him go buy new underwear so he

14:22   15    could go to school.

16       MR. ADLER:  That's correct.

17       THE COURT:  Which displeased a lot of people.

18       MR. ADLER:  I do remember there was a trip to buy some

19    clothes.

14:23   20       THE COURT:  So, in sum, the nature and circumstances

21    of the offense, I have covered that in some detail, being as

22    low level and as least significant as I think you could have.

23    The history and characteristics of the defendant are all highly

24    positive.  He was -- had a life before he decided to go crazy,

14:24   25    and when he returned and was apprehended, he had already gone

14:24   1   back to his normal life and pursued it as best he could in

2   prison and has pursued it in the six weeks or so he has been

3   out.  Is that about right?

4          MR. ADLER:  All total it's actually about six months

14:24   5   now.

6          THE COURT:  Six months.  He went back to doing what he

7   should have done all along with no prodding.  He is studying to

8   be seriously constructive and not leaving him any position of,

9   gosh, I'm out now, but I can't make a living doing anything

14:24   10  because I didn't even stay in school past the eighth grade, or

11  something.  He has done the things to build a responsible self.

12  The offense is serious, but within those that are serious and

13  things that make up most people's impression of terror, the

14  offense is on the extremely low end, the offense, and that's

14:25   15  what we should punish, not what other people and other times

16  and frequently other countries have done.

17          I don't believe there is any reason to further

18  protect the public from the crimes of this man.  I don't think

19  there will be any.  But he would have to be really stupid to

14:26   20  recontact -- please find a seat and make yourself

21  comfortable -- of this nature.  And he's getting vocational

22  training in two ways, from the experience of working and from

23  going to college and trying to get qualified.

24          Needless to say, his criminal history at six is

14:26   25  imaginarily very high, but he didn't do anything to earn the

14:26  1   six except commit the crime he committed that was covered by a

2   statute, or a guideline -- it is a guideline -- that magically

3   gives any terrorist a preexisting top-of-the-limit criminal

4   history.  So that's overstated.  I realize it may sound low,

14:27  5   but the experience he has had of a year and a half in prison

6   after an American-teenager, high-school existence was a shock.

7          The statistics that we have are that these

8   crimes, unlike drugs and armed robbery, do not seem to be a

9   permanent part of a person's character.  He was motivated to

14:28  10  join in by a misbegotten imagination of what was going on in

11  the Middle East.  He left voluntarily.  Actually, he left

12  before he got there, and he cooperated with law enforcement and

13  will continue to do so.  Therefore, I vary to an 18-month

14  sentence and five years of supervised release.  No fine.  No

14:29  15  restitution.

16          MS. FERKO:  Your Honor, can I ask, for purposes of the

17  record, are you adopting the findings of the PSR for the

18  guideline calculation?

19          THE COURT:  Yes, ma'am.  They start with him being a

14:30  20  terrorist.

21          MS. FERKO:  Right.  And as indicated in the PSR, Your

22  Honor, the guideline range and then the maximum of 180 months.

23          THE COURT:  Most of all, he is a terrorist and he gets

24  the terrorist enhancement.  Otherwise, I didn't have to go

14:30  25  through explaining why I was departing down from that.

14:30   1        MS. FERKO:  That being said, Your Honor, the United

        2   States would --

        3        THE COURT:  Apparently my inarticulation said 19

        4   months?  I said 18.

14:30   5        MS. FERKO:  You said 18.  Your Honor --

        6        THE COURT:  Wait.  I'm not through.  Can you wait a

        7   minute?

        8        MS. FERKO:  Yes, Your Honor.

        9        THE COURT:  Without ease of access to a personal

14:31   10  computer and a cell phone would render him unemployable.  It's

        11  gone from being an exotic means of doing all kinds of things to

        12  just an essential part of any job and most personal lives.  But

        13  he can tell -- he will tell probation his -- it's not his email

        14  address.  It's --

14:31   15       MS. FERKO:  As far as with the phone, the computer?

        16       THE COURT:  You get a number.  Where is a computer

        17  person when I need it.

        18       THE LAW CLERK:  The IP address.

        19       THE COURT:  The IP address.  That's pretty good for an

14:32   20  old person.  He will give him the numbers, you know, in his

        21  email address, but if he has to appear, it has a little number,

        22  which is what they ultimately track.  I'm not authorizing you

        23  to track him, but you have them if you need to.

        24       MS. FERKO:  I guess what Your Honor -- I think what

14:32   25  the appendix was asking for along with -- and I don't want to

14:32   1   make it sound like he has to call the probation office every

2   time he uses his phone or his computer.  I just -- I think that

3   the probation office wanted to have the ability to look at his

4   computer and, you know, ask him if there is a certain

14:32   5   application on it or to check on WhatsApp or Kik or any of

6   these multitude of messaging things, if there is any concern by

7   the probation officer during his period of supervised release.

8          I don't think it was a matter of asking whether

9   every time he would log on a computer, he would have to make a

14:32   10   phone call to --

11          THE COURT:  I would ban everybody from using

12   Twitter --

13          MS. FERKO:  Your Honor --

14          THE COURT:  -- regardless of anything.

14:33   15          If the probation officer asks him for all the

16   post cards he has gotten in the last six months, he will

17   deliver all the postcards to him.  In that sense, he may

18   monitor his mail.

19          MR. ADLER:  We have no problem, as part of the normal

14:33   20   supervision duties of the probation office.  If they come to

21   visit his house and they say, Let me see your computer,

22   Mr. Khan will comply with that, of course, and the same for the

23   phone and any other electronic devices.

24          MS. FERKO:  That's all we are asking, Your Honor.

14:33   25          THE COURT:  And if he gets two phones, give them both

14:33   1   of them.  And he is forbidden absolutely from buying disposable

        2   phones.

        3               MS. FERKO:  Yes, Your Honor.

        4               MR. ADLER:  Yes, Your Honor.

14:34   5               THE COURT:  He needs to do some community service.  I

        6   don't know whether I addressed that last time.

        7               MS. FERKO:  I don't believe so, Your Honor.

        8               THE COURT:  I like what he is doing, as long as the

        9   program works, but sometimes programs run off the tracks and it

14:34   10  becomes religious.  I'm not against religious programs, but I'm

        11  not ordering him to do that.  The best, which is in serious

        12  need, is to teach young people English.  If you are bilingual,

        13  there are a lot of people who need your help.  And get them

        14  young because, otherwise, they will end up doing crazy things,

14:35   15  crazier things.

        16               Anything else from the government?

        17               MS. FERKO:  Your Honor, if that is the pronouncement

        18  of your sentence, we just need to object to it.

        19               THE COURT:  Gosh, really?  Thank you.  You are always

14:35   20  welcome to object to what I do.

        21               MS. FERKO:  Thank you, Your Honor.

        22               Your Honor, we would object to the imposition of

        23  this 18-month sentence followed by the five years of supervised

        24  release.  Your Honor, the United States believes that whether

14:35   25  that is based upon the 3553(a) guidelines, Your Honor, that is

14:35   1   not a reasonable sentence in light of Mr. Khan's actions and in

2   light of the guidelines -- of the sentencing guidelines, even

3   though it is only --

4          THE COURT:  The average age of people convicted under

14:35   5   that Act is 26.

6          MS. FERKO:  Yes, Your Honor.  I'm aware.

7          And, Your Honor, we also would object to the

8   downward departure.

9          Thank you, Your Honor.

14:36   10         MR. ADLER:  Judge, I just want to make clear for the

11   purposes of the Fifth Circuit, in case we're headed that way

12   again, that part of your decision today is based on a policy

13   disagreement with the sentencing guideline calculations, or at

14   least the Commission's determination of how the guidelines

14:36   15   should be calculated.

16         The Fifth Circuit has a case called

17   Mondragon-Santiago from 2009 where it said district courts

18   certainly may disagree with the guidelines for policy reasons

19   and may adjust a sentence accordingly.

14:36   20         I just want to make sure that is part of your

21   decision today, as well?

22         THE COURT:  Yes.  To the extent that I have any idea

23   what they were thinking when they came up with parts of that,

24   especially the absolutely arbitrary giving people criminal

14:36   25   histories that they don't have, I feel very bad about playing

14:37   1   let's pretend with people's lives.  And so, if they have a

2   criminal history, I will use it.  If they don't, it shouldn't

3   be used.

4              PROBATION OFFICER:  Special assessment?

14:37   5              THE COURT:  And you have to pay a $100 tax.

6              MR. ADLER:  Yes, Your Honor.

7              THE COURT:  He didn't already do it?

8              MS. FERKO:  Your Honor, I think it was remitted last

9   time.

14:37   10             THE COURT:  Oh, well.  I guess that's res judicata.

11             MS. FERKO:  What is that, Your Honor?

12             THE COURT:  That's res judicata then.  I can't change

13   it.

14                  Mr. Khan, you have the right to appeal.  You have

14:37   15   the right to have a lawyer appointed for your appeal and you

16   can appeal without paying costs.  There is a long, complicated

17   statement about that on the back -- or on the front.  Please

18   read it.  If you understand it, sign it.

19                  You understand it is no reflection on you?

14:38   20             MS. FERKO:  Yes, I do, Your Honor.

21             THE COURT:  Okay.  I just want to make sure.

22                  Anything else, ma'am?

23             MS. FERKO:  Nothing, Your Honor.  That completes my

24   business.  If I may be excused?

14:38   25             THE COURT:  Ms. Kalluri did a beautiful job.

14:38    1            MS. KALLURI:  Thank you, Your Honor.

         2            THE COURT:  I love lawyers who don't talk.

         3                Any questions, Mr. Khan?

         4            THE DEFENDANT:  No, sir.  Thank you.

14:38    5            THE COURT:  All right.  Straight and narrow.  He will

         6    explain what that means.

         7                Thank you, Counsel.

         8                We will take a five-minute recess.

         9        *(Court adjourned at 2:38 p.m.)*

        10                                * * * *

        11        I certify that the foregoing is a correct transcript from

        12    the record of proceedings in the above-entitled cause.

        13    Date: January 3, 2020

        14

        15                    */s/ Mayra Malone*
                         ----------------------------------------
        16                    Mayra Malone, CSR, RMR, CRR
                             Official Court Reporter

        17

        18

        19

        20

        21

        22

        23

        24

        25